Leo L. Pisel, Conservator (Estate of Carol Ann Pisel) *v.* Stamford Hospital et al.

Loiselle, Bogdanski, Healey, Parskey and Rubinow, Js.

Argued December 13, 1979—decision released April 22, 1980

*Gregory C. Willis,* for the appellant (named defendant).

*Richard A. Silver,* with whom were *David S. Golub* and, on the brief, *Ernest F. Teitell,* for the appellee (plaintiff).

PARSKEY, J. This action was brought by the conservator of the estate of Carol Ann Pisel (hereinafter the plaintiff) to recover damages against Stamford Hospital and Dr. John J. Sullivan for alleged malpractice. After a trial to the jury a verdict was returned for the plaintiff against the hospital but in favor of the defendant doctor. The trial court refused to set aside the plaintiff's verdict and the hospital has appealed.

In its appeal the hospital claims that the court erred (1) in failing to grant the hospital's motions for a mistrial, (2) in failing to exclude from evidence a videotape of the plaintiff, (3) in permitting Dr. Gerald H. Flamm to testify, (4) in certain rulings referable to the testimony of Dr. Myer M. Shimelman, (5) in instructing the jury on the issue of pain and suffering, (6) in failing to charge in accordance with five separate requests, and (7) in refusing to set aside the verdict of 3.6 million dollars as excessive. Another claimed error involving the refusal of the court to admit into evidence a memorandum of decision in a related case was specifically abandoned at oral argument.

On January 24, 1976, at 6:15 a.m. the plaintiff was a patient in the defendant hospital's psychiatric unit. She was locked alone in a seclusion room in a highly agitated and psychotic condition, after having told the staff that she was hearing voices telling

her to hurt herself. Shortly after 10 a.m. she was found in the room with her head wedged between the side rail and the mattress of her bed, unconscious, with no pulse, blood pressure, or respiratory function. During that period of nearly four hours no staff member entered the plaintiff's room or had any personal contact with her to assess her mental condition or alleviate her agitation.

Prior to June, 1975, the plaintiff was a normal, healthy twenty-three year old woman with no previous psychiatric problems. In June, 1975, she contracted choriomeningitis and a urinary infection which evolved into psychotic symptomatology. After a hospitalization of approximately six weeks and a three-week recovery period she returned to her full-time job as a dental technician and resumed a normal life. The plaintiff saw Dr. John Sullivan, her psychiatrist, for a period of approximately two months after discharge from the hospital, at which time, of her own volition, she discontinued treatment.

On January 14, 1976, the plaintiff's psychiatric problems having recurred, Sullivan recommended admission to the defendant hospital's psychiatric unit for an expected short-term stay. On that evening she was taken to the hospital by ambulance. She was admitted in a psychotic state with an admitting diagnosis of schizophrenia. At the hospital she complained that the light bulb burning in her head had broken and that she had broken glass in her ear that hurt. She did not recognize her parents, was withdrawn, almost catatonic, agitated, confused and had poor motor coordination. She was admitted to the unit's Ford Wing, the area designated for the most agitated patients, and put to bed.

On January 15, because of her highly agitated state, Sullivan ordered her placed in the psychiatric unit's quiet room. This was a seclusion and isolation room used for agitated and psychotic patients. Because of her condition all furniture, including a steel bed frame, was removed from her room. The steel bed frame was removed for safety reasons; it remained out of the room for three days except for brief periods when it was wheeled into the room, and the plaintiff was kept in arm and leg restraints. On the fourth day the bed frame was returned to the room. The hospital records contain no entry authorizing the return of the frame and Sullivan denied ordering its return.

Between January 15 and 23, the plaintiff remained psychotic, with continuing bizarre behavior, hallucinations, irrationality, lack of contact with reality and agitation. Restraints were often necessary. Electric shock treatment was administered without improvement to her condition. On January 20, she sustained a grand mal seizure and thereafter continued to display disorientation, confusion, agitation and at times hostility. On January 21, Sullivan ordered antipsychotic medication. The nursing staff failed to record the order until the following day, at which time the staff discovered that the medication was out of stock. Despite this knowledge, the staff failed to notify Sullivan or to seek a substitute antipsychotic medication. As a result, for a three-day period the plaintiff received no antipsychotic medication and her agitation consequently increased.

On the evening of January 23, the plaintiff's condition grew acute. She was agitated, disoriented and confused, and appeared to be hallucinating. She was walking and running in circles, "chasing her-

self," and at times walking into walls. Because of her condition the staff maintained constant observation in order to ensure her safety and to calm and reassure her. The door to her room was kept open and unlocked because the staff was more comfortable keeping her in sight and because it was difficult to see into her room when the door was closed. At the change of shifts at midnight, the evening staff informed the members of the next shift that the plaintiff had been in bad condition throughout the evening and bore very close watching.

At 6 a.m. on January 24, the plaintiff came out of her room in an agitated condition and attempted to leave the Ford Wing. She made a similar attempt on two other occasions that morning. Hospital records reflect that she stated to one staff member that she was hearing voices telling her to hurt herself. The plaintiff's remarks were especially significant because she had previously responded to voices telling her not to eat and not to take her medication by refusing either to eat or to take her medication. In response to the statement the staff administered a sedative and locked her alone in the seclusion room which contained a steel bed frame. One side rail was up, the other down even though the plaintiff had a known history of attempting to climb over side rails.

No antipsychotic medication was given to the plaintiff that morning to alleviate her agitation or her hallucinations nor was her physician notified of her acute condition. Although the plaintiff was observed awake from 7:30 to 8 a.m., no staff member attempted to speak with her or assess her condition, nor did any member of the staff enter the

room to break the seclusion or calm her agitation. From 8 to 10 a.m., the plaintiff remained locked in her room. From 6:15 until 10 a.m., no one entered her room to assess her condition, although at 9:50 a.m., she was seen awake and psychotic. Shortly after 10 a.m., she was found in the position previously described, unconscious, with no pulse, blood pressure or respiratory function.

A few days following the plaintiff's injury, the director of nursing at the hospital ordered the entire staff who charted the plaintiff's care to rewrite and change the hospital records pertaining to the care she received on the morning of January 24. The original record was surreptitiously removed from the chart and a "revised" record was substituted without the knowledge of the hospital administration and in violation of explicit hospital policy. The substituted record was demonstrably false and conflicted with other records and the testimony of staff members on duty that morning as to their actual observations. The revised record came to light after suit was commenced when a nurse not connected with the psychiatric unit brought to the attention of the hospital administration that she had been forced to rewrite a note on the original record. The trial court instructed the jury without objection that they could consider the substitution of the records as a circumstance indicating the defendant's consciousness of negligence.

## I

### Motions for Mistrial

The defendant points to two instances where it claims that remarks by the plaintiff's counsel improperly brought certain information to the

jury's attention and that the prejudicial effect of this information warranted a mistrial. The first instance occurred during the plaintiff's recross-examination of the chief of the defendant's psychiatric unit. On redirect examination defense counsel elicited from the doctor that in January of 1976, the hospital had been duly licensed by the state of Connecticut. On recross-examination the plaintiff's counsel inquired whether the state required written nursing policies. The doctor responded that the state inspected its written policies on an annual basis. Counsel then inquired whether the state had reviewed the nursing policy book that was in effect on January 24, 1976. Upon objection by counsel for Sullivan the court inquired as to the purpose of the question, to which the plaintiff's counsel responded that the purpose was to demonstrate that there was criticism from the state of Sullivan's policy. The court sustained the objection. Later in denying the defendant's motion for a mistrial the court commented that the remark was in response to an inquiry from the court and that considering all the factors it would not prevent the defendant from obtaining a fair trial. In its charge the court reminded the jury that whenever an objection was sustained and evidence or remarks were excluded or ordered stricken such remarks or testimony were not evidence in the case and were not to be considered by them.

The second instance occurred during the testimony of Dr. Austin McCawley, director of psychiatry at St. Francis Hospital in Hartford. McCawley was asked a series of questions by Sullivan's counsel with respect to the seclusion rooms at St. Francis Hospital to which McCawley responded that the seclusion rooms can be locked, their doors

have windows and they cannot be viewed from the nursing station. On cross-examination the plaintiff's counsel inquired whether St. Francis had closed circuit video monitoring of the seclusion rooms from the nursing station. McCawley answered "not in '76." After objection was sustained to the further question whether St. Francis had such monitoring at present, the court ordered the reference stricken and instructed the jury to disregard it.

We examine these two occurrences with certain principles in mind. "The trial court is vested with a large discretion over matters occurring in the conduct of the trial. While this is a judicial discretion and therefore subject to some degree of review and control, its exercise will not be interfered with unless it has been clearly abused to the manifest injury of a litigant." *Wooster* v. *Wm. C. A. Fischer Plumbing & Heating Co.*, 153 Conn. 700, 702, 220 A.2d 449 (1966). "The question before us on this appeal is not, primarily, whether the remarks in question were proper or improper, but it is whether the action of the trial court in refusing to grant a new trial on account of them, in the exercise of its discretion, so far exceeded or abused the discretion committed to it in a matter of this kind as to warrant us in granting a new trial." *State* v. *Laudano*, 74 Conn. 638, 646, 51 A. 860 (1902). In making our independent assessment we do so under the limitations of a printed record, without the benefit of instant replay or of the sights and sounds of a trial in action. The trial judge, on the other hand, is in a better position to sense the atmosphere of the trial and therefore can apprehend far better than we can the effect of certain remarks on the jury. *Marko* v. *Stop & Shop, Inc.*, 169 Conn. 550, 559, 364 A.2d 217 (1975); *Butler* v. *Steck*, 146 Conn. 114, 119, 148

A.2d 246 (1959). Therefore, when the trial judge at the time of his judgment call and later, upon further reflection, in his memorandum of decision, expresses the view that the questioned remarks "did not even remotely" affect the defendant's opportunity for a fair trial, we must give this opinion great weight; *Marko* v. *Stop & Shop, Inc.,* supra, 558; and in the absence here of a clear showing to the contrary, we do not disturb his ruling.

## II

### ADMISSION OF VIDEOTAPE

The court admitted into evidence, over the defendant's objection, a "videotape"[1] of the plaintiff at the Stamford Hospital. The tape, about twenty minutes long, was offered to show the plaintiff's daily activities at the time of trial. The plaintiff's mother and father appear briefly in the tape. The plaintiff represented to the court that, with rare exception, Mr. and Mrs. Pisel visited the plaintiff daily at the hospital and to a limited extent participated in her therapy. Their presence in the tape, therefore, fairly and accurately depicted the plaintiff's daily routine. Before ruling on the objection the court viewed the tape. In overruling the objection the court concluded that the evidential value of the tape outweighed its prejudicial effect.

It is well established that motion pictures, when properly authenticated and relevant to the issues in the case, are admissible in evidence in the discretion of the court. Note, 62 A.L.R.2d 686, 688. The rules which apply to the admissibility of photo-

---

[1] This is a motion picture film so designated by the parties.

graphs also apply to that of motion pictures, including videotapes. Scott, Photographic Evidence (2d Ed.) §§ 1294, 1297; 29 Am. Jur. 2d, Evidence § 801. Thus, if a motion picture has a tendency to prejudice the jury, the question before the court is whether its value as evidence outweighs its possible prejudicial effect. *State* v. *LaBreck,* 159 Conn. 346, 351, 269 A.2d 74 (1970); *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223 (1952). When a film represents a staged reproduction of one party's version of the facts it should be examined with care because of the danger that the filmmaker's art may blur reality in the minds of the jury. McCormick, Evidence (2d Ed.) § 214. After examining the videotape, with the above principles in mind, we agree with the trial court that "the tape, while not pleasant viewing, fairly presented to the jury Miss Pisel's condition and the type of care she was required to receive."

### III

#### TESTIMONY OF FLAMM

The plaintiff called as an expert witness Dr. Gerald H. Flamm, chairman of the department of psychiatry at St. Raphael's Hospital in New Haven, for the limited purpose of answering a hypothetical question based upon evidence in the case. The defendant objected to Flamm testifying on behalf of the plaintiff because he had attended a claims review panel meeting where the facts of the case had been discussed. The defendant claimed that Flamm's attendance at the panel meeting disqualified him as a witness under the provisions of § 19-6a and § 52-197a (now § 38-19a) of the General Statutes.

Section 19-6a[2] protects the confidentiality of information records and miscellaneous other data obtained by staff committees of accredited health facilities in connection with the study of morbidity or mortality by such committees. Section 52-197a[3] similarly precludes the disclosure of any opinions by a medical review committee presented during proceedings by such committee. The defendant claims that these statutes preclude any doctor who had no first hand knowledge of a patient's situation but who had attended a peer review meeting from testifying in a case because "inevitably that which he heard at the time of the peer review committee meeting, which was indeed privileged, could not be excluded from his mind as he testified."

---

[2] "[General Statutes] Sec. 19-6a. CONFIDENTIALITY OF RECORDS CONCERNING MORBIDITY AND MORTALITY. All information, records of interviews, written reports, statements, notes, memoranda or other data . . . procured by . . . staff committees of facilities accredited by the department of health services in connection with studies of morbidity and mortality conducted by . . . such staff committees . . . for the purpose of reducing the morbidity or mortality from any cause or condition, shall be confidential and shall be used solely for the purposes of medical or scientific research. Such information, records, reports, statements, notes, memoranda or other data shall not be admissible as evidence in any action of any kind in any court . . . nor shall it be exhibited or its contents disclosed in any way . . . by any person participating in such a research project or by any other person . . . . This section shall not be deemed to affect disclosure of regular hospital and medical records made in the course of the regular notation of the care and treatment of any patient, but only records or notations by such staff committees pursuant to their work."

[3] "[General Statutes] Sec. 52-197a. [Now Sec. 38-19a.] PEER REVIEW IMMUNITY. OPINIONS NOT SUBJECT TO DISCOVERY. . . . (d) The opinions of a medical review committee shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any opinions of said committee presented during the proceedings.

The defendant's construction of these statutes is much too broad. The purpose of these statutes is to keep peer review studies, discussions and deliberations confidential. A facial examination of the statutes reveals that they are not designed to disqualify a doctor from testifying. Rather, they seek to circumscribe the subject matter of his testimony by precluding him from disclosing those matters which were part of the peer review proceedings.

Flamm was not asked to disclose what occurred at the claim review meeting. He was first asked whether he was familiar with the standard of care practiced by hospitals in Connecticut having a psychiatric unit and then asked the source of his knowledge. He was then presented with a lengthy statement of assumed facts and asked whether based on such facts the defendant measured up to the standard. Nothing in either of the statutes precluded Flamm from answering this question.

## IV

### TESTIMONY OF SHIMELMAN

Dr. Myer M. Shimelman, director of the inpatient psychiatric unit at St. Raphael's Hospital, when called as an expert witness by the plaintiff, stated without objection on direct examination that he had testified on behalf of the plaintiff in the *Bensen* v. *Norwalk Hospital* case; *Bensen* v. *Norwalk Hospital,* Superior Court, judicial district of Fairfield at Stamford, Docket No. 022284; which involved psychiatric care at the Norwalk Hospital. On cross-examination he acknowledged that he had been paid for his time in the *Bensen* case. He was then asked whether since the *Bensen* case he had testified in

court on behalf of any plaintiff in any other "alleged" malpractice cases. He responded in the negative. On redirect examination the court permitted Shimelman, over the defendant's objection, to state that the *Bensen* case involved a psychotic woman who was allowed to wander off from the psychiatric unit and out a window. The plaintiff claims that this evidence was admissible to dispel the implication raised by the cross-examination that the doctor's testimony was motivated primarily by financial considerations rather than by sincere professional medical opinion. We need not address this issue further because the information disclosed by the doctor had been testified to earlier by another witness without objection and therefore was merely cumulative. *Sitnik* v. *National Propane Corporation*, 151 Conn. 62, 66, 193 A.2d 503 (1963).

Objection is also pressed regarding the court's failure to strike Shimelman's testimony on redirect examination describing how he would have treated the patient. On direct examination Shimelman testified that in his opinion the plaintiff's injuries resulted from the defendant's failure to meet the applicable standard of care. On cross-examination he was examined about various treatment methods he used at St. Raphael's and at Veterans Administration Hospitals, particularly the use of seclusion and constant observation. The defendant inquired as to the doctor's rationale for using constant observation rather than seclusion. Because the defendant's questions focused on the doctor's method of treating a psychotic patient, it was allowable for the doctor on redirect examination to explain how he would have handled the plaintiff were he the treating physician. *Kucza* v. *Stone,* 155 Conn. 194, 198, 230 A.2d 559 (1967).

We deal briefly with two other rulings involving the testimony of Shimelman. Inquiry was made of the doctor concerning the treatment of psychiatric patients at the Veterans Administration Hospital in West Haven. An objection by the defendant that this was not a general hospital was initially sustained by the court. Later, after hearing argument about the nature of this Veterans Administration facility, the court overruled the objection. This ruling was entirely proper. The plaintiff produced testimony indicating that the West Haven Veterans Administration Hospital was a general hospital with a psychiatric unit. This uncontradicted evidence provided a sufficient basis for Shimelman to testify as to the standard of care for operating a seclusion room.

Finally, the defendant objects to the court's permitting Shimelman to testify that having the plaintiff in a steel bed in a seclusion room when she was not under constant observation was not a question of judgment but rather a sheer matter of responsibility. The basis of the objection was that the admission of this testimony was a clear invasion of the province of the jury. We find no merit to this objection. The doctor, having been repeatedly asked on cross-examination whether the decision to have the plaintiff on constant observation or in a seclusion room was a matter of judgment, certainly could respond to questions on redirect which explored this matter further with specific reference to the facts of the case. Where expert testimony is required to determine the issue of professional negligence often that testimony must include an opinion differentiating between professional judgment and professional responsibility even though such opinion may encompass the ultimate issue to

be determined by the trier. *State* v. *Johnson*, 140 Conn. 560, 563, 102 A.2d 359 (1954); *Lentine* v. *McAvoy*, 105 Conn. 528, 533, 136 A. 76 (1927).

## V

### PAIN AND SUFFERING

The defendant claims that there was no evidence of conscious pain and suffering and that as a result there was no basis for the court's charge in this respect. The defendant does not question the content of the charge, but contends that the court erred by giving it at all. If there is an issue of fact which can be reasonably determined or reasonably inferred from the evidence, then the determination of that issue presents a submissible question for the jury. *Katsetos* v. *Nolan*, 170 Conn. 637, 655–56, 368 A.2d 172 (1976).

The record is replete with evidence showing conscious pain and suffering. The nurse's notes bear silent witness to the existence and extent of such pain and suffering. A few examples will suffice. February 29, 1976: "Eyes open – somewhat restless – appearance of questioning – moving lips as if attempting to talk – reassured. Told her she would be able to talk after trach removed. Seemed to be relaxed somewhat." March 18, 1976: "Patient screamed when turned. Very resistant while turning." March 20, 1976: "Turns head toward voices when awake." June 27, 1976, 2:30: "Moderately severe spasm. Agitated, moaning, despite positional changes." August 4, 1976: "Restless and moaning." September 6, 1977: "Moaning, hollering, rigid, diaphoretic. Arms rigid and raised as if she were reaching up. Moaning."

## VI

### REQUESTS TO CHARGE

The defendant claims error in the court's failure to charge the jury in accordance with four separate requests.[4] Although the defendant has not complied with Practice Book, 1978, § 3060F,[5] we shall, nevertheless, review the claim in the interest of justice. See Practice Book, 1978, § 3164.

The defendant requested the court to charge the jury that the plaintiff failed to produce any evidence that the standard practice of similar hospitals in the community differed in any respect from the defendant's standards, that the standard practice of similar hospitals required the defendant to do anything different from what it had done and that these are the bases upon which the defendant's acts must be judged. In making this request the defendant, in essence, was asking for a directed verdict. Obviously, if the defendant's standards were no different from those of similar hospitals and if the defendant's conduct measured up to those standards there would be no basis for a recovery by the plaintiff.

---

[4] The defendant's fifth request, designated No. 30, is not discussed in the brief and therefore is considered abandoned. *O'Connor* v. *Dory Corporation*, 174 Conn. 65, 70, 381 A.2d 559 (1977).

[5] "[Practice Book] Sec. 3060F. (Formerly Sec. 3054).—APPELLANT'S BRIEF; FORM. The appellant's brief shall contain the following: . . . (c) . . . (1) In a jury case when error is claimed in the trial court's refusal to charge as requested, the party claiming such error shall request the clerk of the trial court to include, in the certified file, copies of the relevant written request to charge contained in the trial court's file and shall print in his brief a verbatim statement of the relevant portions of the charge as requested and as given by the court and any relevant exceptions to the charge as given and shall print in narrative form any evidence which he claims would entitle him to the charge as requested, with appropriate references to the page or pages of the transcript. . . ."

In fact the plaintiff offered a plethora of evidence that the defendant violated the standard of due care. There was evidence that the defendant failed to remove the steel bed frame from the seclusion room, failed to place both side rails of the bed down, used an improper mattress, failed to maintain constant observation of the plaintiff, failed to assess personally the patient and break the seclusion, failed to notify the plaintiff's physician or a hospital physician of a significant change in the plaintiff's condition and improperly designed and located the seclusion room. While the evidence of failures or improper conduct was disputed by the defendant there was a submissible issue of fact which the defendant's request sought to remove from the jury. When the evidence is contested, a request to charge which is so worded as to be equivalent to a directed verdict is improper. *DeCarufel* v. *Colonial Trust Co.,* 143 Conn. 18, 20, 118 A.2d 798 (1955).

The defendant requested two charges on foreseeability. After rejecting these requests, the court charged the jury as follows: "One of the tests for determining whether the defendants exercised that degree of care, skill and diligence required under the circumstances is whether the harm that resulted from the lack of care could reasonably have been foreseen. The plaintiff need not prove, however, that the defendant could foresee that her injury would occur in exactly the manner it did. The concept of foreseeability means only that the harm of the general nature of that suffered might have been anticipated that Miss Pisel might in some way cause herself harm on the bed. Was it foreseeable that the harm of the general nature of that which occurred could have occurred." This charge correctly stated

the law. *Steinhaus* v. *Steinhaus,* 145 Conn. 95, 98, 139 A.2d 55 (1958); *Borsoi* v. *Sparico,* 141 Conn. 366, 369–70, 106 A.2d 170 (1954); *Orlo* v. *Connecticut Co.,* 128 Conn. 231, 237, 21 A.2d 402 (1941). The court properly refused to give the defendant's instructions that the defendant could not be held liable for a bizarre or unusual occurrence which it had no reason to foresee because that is not the law. It is quite apparent that the defendant has a parallactic view of foreseeability. For example, it cites correctly the statement in *Wright* v. *Coe & Anderson, Inc.,* 156 Conn. 145, 152, 239 A.2d 493 (1968), that the test of foreseeability is: "[W]ould the ordinary man, in the defendant's position, knowing what it knew or should have known, anticipate that harm of the *general nature* of that suffered by the plaintiff was likely to result unless reasonable care was taken." (Emphasis added.) Then it introduces a distortion by applying this principle to the present case using the following language: "[W]ould the hospital personnel in the same position as the hospital personnel in this case, in the exercise of that degree of care, skill and diligence as possessed and exercised by other hospital personnel in the state in living up to the required standard of care . . . , foreseen [sic] a patient coming to harm *in the manner* that it claimed this plaintiff did." (Emphasis added.) It is the general harm that must be foreseen, not the particular injury.

The concept of foreseeability was correctly applied in this case to determine if the harm which resulted was within the scope of the risk created by the defendant's conduct. See Restatement (Second), Torts § 281, comment f. The defendant seeks to combine this issue with the question of whether it should be held liable for unusual consequences of its

negligence which came about in a bizarre manner. Although the two issues often overlap, one concerns whether certain conduct is negligent at all, while the other is purely a question of proximate cause. See James, "Scope of Duty in Negligence Cases," 47 Nw. U. L. Rev. 196 (1953); Prosser, "Palsgraf Revisited," 52 Mich. L. Rev. 1 (1953). We address the proximate cause issue infra. Concerning the first issue, so long as harm of the general nature as that which occurred is foreseeable there is a basis for liability even though the manner in which the accident happens is unusual, bizarre or unforeseeable. *Figlar* v. *Gordon,* 133 Conn. 577, 582, 53 A.2d 645 (1947); *Mitnick* v. *Whalen Bros., Inc.,* 115 Conn. 650, 651, 163 A. 414 (1932). The foreseeability issue, put in proper perspective, is not very complex. It was a jury question whether the defendant could have anticipated that harm would come to the plaintiff from the steel frame bed given all the factors which the defendant knew or should have known. The jury's affirmative answer cannot be disturbed.

Finally, the defendant requested a charge[5] absolving it of liability as a matter of law if the jury concluded that the physicians and hospital personnel took a calculated risk in the treatment of the plaintiff. The court properly refused this request because it is not a correct statement of the law. *State* v. *Chetcuti,* 173 Conn. 165, 171, 377 A.2d 263 (1977). A physician is absolved from a bona fide

---

[5] The defendant's request reads as follows: "You have heard testimony in this case that the doctor and medical staff must take a calculated risk in balancing the need for the patient's safety against the goal of returning the patient to a useful role in society. If you conclude that the physicians and the hospital personnel took a 'calculated' risk in the treatment of the plaintiff, then I charge you that as a matter of law neither the physicians nor the hospital are liable in this case and the verdict should be for the defendants."

error of judgment only if he exercises the requisite care and skill. *Green* v. *Stone,* 121 Conn. 324, 330, 185 A. 72 (1936). The requested charge, however, is so broad that it would have swept under the protective umbrella of calculated risk any and all acts of omission or commission no matter how egregiously negligent.

## VII

### Basis for Plaintiff's Verdict

The defendant asserts that the plaintiff failed to establish the existence of a standard of care with which the defendant was required to comply, failed to prove any of her allegations of negligence, failed to prove that the occurrence was foreseeable and failed to remove the cause of the injury from the realm of speculation. The defendant contends, therefore, that the court erred in refusing to set aside the verdict as contrary to law and in denying the defendant's motion for judgment notwithstanding the verdict.

### A

### Proof of the Standard of Care

In order to prevail in a malpractice case the plaintiff must establish through expert testimony not only the standard of care but also that the defendant's conduct did not measure up to that standard. *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 616, 356 A.2d 887 (1975). With regard to the qualifications of the expert witness the crucial question is not whether he practiced in the locale where the accident occurred but rather whether he knows what the standard of care is in the locale. *Ardoline* v. *Keegan,* 140 Conn. 552, 557, 102 A.2d 352 (1954). For purposes of determining the standard of care

applicable to an accident occurring in Stamford, the pertinent area includes at least the entire state of Connecticut. *Katsetos* v. *Nolan,* 170 Conn. 637, 646, 368 A.2d 172 (1976). Before we examine the evidence itself a resume of the qualifications of the several expert witnesses called by the plaintiff is in order.

Dr. Stephen Fleck is a board certified psychiatrist and is deputy chairman and professor of psychiatry at the Yale Medical School. He is psychiatrist in chief of the Yale Psychiatric Institute and the Connecticut Mental Health Center. He is on the consultant staff of the Stamford Hospital, the West Haven Veterans Administration Hospital and the Connecticut Valley Hospital. He established the general inpatient psychiatric ward at the Yale-New Haven Hospital, a general hospital, and is active in clinical care on that ward. He also is in charge of the entire clinical operations of the Yale Psychiatric Institute inpatient facility treating seriously ill mental patients. Fleck testified that he was familiar with the standard of psychiatric care practiced at general hospitals in the state of Connecticut in January, 1976.

Dr. Gerald Flamm is chairman of the department of psychiatry at St. Raphael's Hospital in New Haven and has held this position since 1971. During this same time he has been clinical professor of psychiatry at the Yale Medical School. He is also a consultant at Connecticut Valley Hospital. He has been board certified in psychiatry since 1964, and is an examiner for the American Board of Psychiatry. Flamm is president of the American Association of General Hospital Psychiatrists, the purpose of which is to develop standards of care and education. He was president of the Connecticut Psychiatric

Society, and for a number of years has been chairman of the society's peer review committee, which monitors quality and standard of care. He testified that he was familiar with the standards of psychiatric care practiced at general hospitals in the state of Connecticut in January, 1976.

Dr. Myer M. Shimelman is director of inpatient psychiatric services at St. Raphael's Hospital in New Haven and an assistant professor of psychiatry at Yale Medical School. He is on the staff of the Yale-New Haven Hospital and has been on the staff of the Griffin Hospital in Derby. Commencing in June of 1972, he became assistant director of psychiatry at the West Haven Veterans Administration Hospital, a general hospital. While in that position he assisted in the design of the psychiatric security unit at the West Haven Veterans Hospital, which contained a seclusion room. He was director of the psychiatric emergency room and established the psychiatric crisis intervention unit for the Bronx Municipal Jacobi Hospital, which at that time was a general hospital with a psychiatric unit. He was responsible for the administration of the psychiatric emergency room and also responsible for approximately fifty psychiatric emergency evaluations per day. He has a private psychiatric practice in addition to his clinical responsibilities at St. Raphael's Hospital. He testified that he was familiar with the standard of psychiatric care practiced at general hospitals in the state of Connecticut in January, 1976.

Doris Banchik, Registered Nurse, is chairman of the Psychiatric Mental Health Nursing Program at the Yale School of Nursing. From 1974 through 1977, she held the position of clinical specialist and assistant supervisor of the department of psychia-

tric nursing at Yale-New Haven Hospital, together with being an instructor of psychiatric nursing at the Yale University School of Nursing. In January of 1977, she had the responsibility for making sure that the psychiatric standard of care was being adhered to at the Yale-New Haven Hospital, and was responsible for the in-service education of the psychiatric nursing staff and the direct supervision of the nursing staff at the psychiatric unit. Since July of 1978, she has been assistant professor in psychiatric nursing at the Yale School of Nursing, which has trained the present directors of psychiatric nursing at Waterbury Hospital, Griffin Hospital, Middlesex Memorial Hospital and Park City Hospital, in what is known as the "Yale Model." She testified that she was familiar with the "Yale Model" in January of 1976. Previous testimony in the case indicated that the defendant relied on the "Yale Model" for its standard of care for nurses.

Susan Faris, Registered Nurse, is the supervisor of nursing for the department of psychiatry at St. Raphael's Hospital. She is the chairman of the General Hospital Psychiatric Nurse Managers Group, which is a group of nursing supervisors throughout the state of Connecticut who are concerned with the proper standard of care for psychiatric nursing in the state. She testified that she had personal knowledge of the care, skill and diligence ordinarily possessed and exercised by registered nurses, licensed practical nurses, and psychiatric technicians in the care of psychiatric patients in psychiatric units at general hospitals in the state of Connecticut as of January of 1976.

Vivian Romoff, Registered Nurse, is a licensed nurse in the state of Connecticut. She completed her nursing program at the City University of New

York and obtained her master's degree in psychiatric nursing from Yale University School of Nursing in 1972. She later became supervisor of psychiatric nursing at the Yale-New Haven Hospital and was on the faculty of the Yale School of Nursing and the Yale School of Medicine. She established the general psychiatric nursing procedures and policies for the opening of the psychiatric unit at Yale-New Haven Hospital, which policies are still in effect. She is presently the director of nursing and assistant director of the hospital for clinical services at the Western Psychiatric Institute and Clinic in Pittsburgh, Pennsylvania, a 120-bed hospital affiliated with the University of Pittsburgh School of Medicine, department of psychiatry. She testified that she was aware of the standard of care, skill and diligence ordinarily possessed and exercised by nurses, licensed practical nurses, and psychiatric technicians in Connecticut as of January of 1976, and by general hospital psychiatric units. She gained this familiarity because she spent six years in Connecticut working in psychiatric nursing and has maintained professional contact with psychiatric nurses still working in Connecticut in various capacities, as well as an awareness of the national standard of care in reference to nurses in general hospitals.

There was evidence from the plaintiff's expert witnesses that if a psychotic person is placed in a seclusion room the standard of care requires that no objects or furniture should be left there that could cause the patient harm. This requirement applies specifically to the steel bed frame; that if a bed is left in the room with a patient who has a history of attempting to climb over bed rails, the rails should be in the down position; that a mattress

used on the bed should not be so small as to leave substantial space between the mattress and the side rails; that a patient in the plaintiff's acute psychotic state should be kept under constant observation; that seclusion should be broken at regular short intervals and the patient's condition assessed; and finally, that when a patient's condition deteriorates to the point where she hears voices telling her to hurt herself, her physician or at least a hospital physician should be notified immediately so that the patient's situation and condition may be evaluated. Although the defendant's evidence disputed most if not all of the plaintiff's evidence, the defendant's bald assertion that the plaintiff introduced no evidence to establish the existence of any psychiatric standard of care does not comport with the facts.

## B

### PROOF OF NEGLIGENCE

Having established the applicable standard, the plaintiff then introduced an abundance of evidence that under the circumstances in this case the defendant violated that standard. The defendant's staff recognized the need to remove the steel frame bed for the plaintiff's safety; the staff actually kept the bed out of the seclusion room, except for brief intervals, during the first three days of the plaintiff's hospitalization. It was returned on the fourth day without any order from her own or any other physician. Even though the plaintiff's situation deteriorated, a condition which one of the defendant's experts admitted would have required the removal of the bed for safety reasons, the bed nevertheless was permitted to remain in the seclusion room. The use of an improper day mattress on the bed provides another example of negligence. The failure to main-

tain constant observation of a patient who was hallucinating and hearing voices telling her to hurt herself, one such instance occurring on the very morning of the tragic injury, is still another example. The failure of the defendant to have a written policy on seclusion and the failure to break the plaintiff's seclusion were clear violations of the applicable standard of care, as was the design and location of the seclusion room so that the inside was not clearly visible from the nursing station. Finally, the failure to notify Dr. Sullivan on the morning of January 24, of significant changes in the plaintiff's condition was also improper. Any one of these acts of negligence was sufficient in the opinion of the plaintiff's experts to be a substantial factor in producing the plaintiff's injury.

In addition to all the other evidence in the case, the significance of the revised hospital record should not be overlooked. Although the defendant understandably attempts to minimize what was done by characterizing the action as merely one of ordering expanded notes and by attributing it to poor judgment, the trier was not required to be so charitable. An allowable inference from the bungled attempt to cover up the staff inadequacies on the morning of January 24, was that the revision indicated a consciousness of negligence. The court so charged and the jury could so find.

## C

### PROXIMATE CAUSE

The defendant's assertion that the plaintiff failed to remove causation from the realm of speculation is without substance. Causation may be proved by circumstantial evidence and expert testimony. *Slepski* v. *Williams Ford, Inc.,* 170 Conn. 18, 22, 364 A.2d

175 (1975). The plaintiff relied on both in this case to establish the mechanism of the injury. The plaintiff wedged her neck between the side rails and the mattress. She was observed at 10 a.m. on January 24 with her neck in this position and her feet on the floor. In this posture the plaintiff had respiratory problems which caused a decrease of blood to the brain and the resultant brain damage. There was sufficient evidence from which the jury could conclude that the wedging of the plaintiff's neck was brought about by the defendant's negligence and this was a substantial factor in producing the plaintiff's brain damage. The defendant's argument that it should not be liable for the plaintiff's injuries in this case because the injuries came about in an unusual, unforeseeable manner is not well taken. In *Mitnick* v. *Whalen Bros., Inc.,* 115 Conn. 650, 163 A. 414 (1932), for example, the plaintiff, who was standing on a sidewalk close to an intersection, was frightened by the collision of two cars within the intersection and suffered a miscarriage. The fact that neither driver could anticipate the results for which the plaintiff sought recovery was held to be no basis for denying the liability of the two drivers. And in *Wolfe* v. *Checker Taxi Co.,* 299 Mass. 225, 12 N.E.2d 849 (1939) the decedent, a policeman, was sitting in his squad car when the defendant's speeding taxi struck a nearby pushcart forcing it into the squad car. The decedent bit his tongue as a result of the collision; the wound became infected and caused his death. The court held that it need not be foreseeable that a particular person is hurt or that an injury would result in any one particular manner.

Unusual or bizarre results can become a factor on the question of proximate cause, but only when with the benefit of hindsight it appears highly extraordi-

nary that the actor's negligent conduct should have brought about the plaintiff's injury. *Mitnick* v. *Whalen Bros., Inc.,* supra; Restatement (Second), Torts § 435 (2). Applying that test to this case we do not find it extraordinary that a psychotic patient who is delusional and whose view of space and distance is distorted might wedge herself between a mattress and a side rail in attempting either to hurt herself or to extricate herself from what may have appeared to her to be her place of confinement.

## VIII

### EXCESSIVENESS OF VERDICT

The defendant contends that the verdict of 3.6 million dollars is four times as large as any verdict ever returned in this state and that its size alone is indicative of prejudice, passion, bias, sympathy and total misunderstanding of the law and the facts on the part of the jury. In denying the defendant's claim of excessiveness the trial court reasoned that the evidence of the plaintiff's injury, her incapacity and her incurred and projected expenses for care and medical treatment would have supported a substantially higher verdict and that "it is not a verdict which 'so shocks the sense of justice' as to warrant the court's interference."

We review the verdict in this case in the light of certain principles. First, the amount of an award is a matter peculiarly within the province of the trier of facts. *Angelica* v. *Fernandes,* 174 Conn. 534, 535, 391 A.2d 167 (1978); *Johnson* v. *Flammia,* 169 Conn. 491, 499, 363 A.2d 1048 (1975). Second, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exor-

bitant. *Thomas* v. *Katz,* 171 Conn. 412, 416, 370 A.2d 978 (1976). "The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." *Birgel* v. *Heintz,* 163 Conn. 23, 28, 301 A.2d 249 (1972); Maltbie, Conn. App. Proc. § 197. Third, the ruling of the trial court on the motion to set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness. *Mansfield* v. *New Haven,* 174 Conn. 373, 375, 387 A.2d 699 (1978).

As a result of the occurrence the plaintiff has remained in a semi-comatose state described by her physician as a "slightly altered level of awareness." Her present condition is permanent. She will require full nursing care in a skilled nursing facility for the rest of her life, her remaining life expectancy having been estimated to be approximately forty-one years.

Because of her neurological injuries, the plaintiff requires three shifts of private nurses on a twenty-four hour basis to care for her everyday personal and medical needs. She requires constant nursing care for every bodily function. She will be totally dependent on this care for the rest of her life. She is unable to feed herself because she cannot properly swallow, and is therefore fed with specially prescribed nutrients every two or three hours through a surgically implanted gastrostomy tube. This tube requires attention on a daily basis and periodical surgical intervention. Constant supervision is

necessary to prevent aspiration of fluid into the lungs and also to deter bladder and urinary infection.

The medical and hospital bills to the date of the trial totaled $317,000. The annual costs of future medical care are estimated to be $91,900. Dr. Richard Martin, chairman of the department of economics of the University of Hartford, projected the cost of medical care over the plaintiff's life expectancy, discounted this cost to determine present value and arrived at a figure in excess of six million dollars for medical expenses. Although this evidence remained uncontroverted the jury were not obliged to accept it. On the other hand, they were at liberty to accept what part of it they chose and factor it into their total calculations. In addition, the jury had a right to consider the destruction of the plaintiff's earning capacity whose present value Dr. Martin calculated to be $222,000. They also had a right to evaluate the plaintiff's permanent injury and its effect on her ability to pursue life's enjoyments. Finally, they had a right to consider and evaluate such pain and suffering as they found resulted from the injury.

Giving due weight to the principles which we stated earlier, we conclude that the jury could reasonably arrive at the result which they did. While the amount of the verdict is substantial, in a relative sense it is no more substantial than the plaintiff's injury.

There is no error.

In this opinion the other judges concurred.