Everlena COLEMAN, Administratrix of
the Estate of Bobby
Coleman, deceased

v.

Karol SIEDEL, Individually and in his
representative capacity.

No. H–77–370.

United States District Court,
D. Connecticut.

Dec. 4, 1980.

John D. Jessep, Koskoff, Koskoff & Bieder, Bridgeport, Conn., for plaintiff.

William E. Glynn, Day, Berry & Howard, Hartford, Conn., Frank Rogers, Asst. Atty.

Gen., Carl R. Ajello, Atty. Gen., Meriden, Conn., for defendant.

## RULING ON PLAINTIFF'S MOTION FOR A NEW TRIAL LIMITED TO THE ISSUE OF DAMAGES AND DEFENDANT'S MOTION FOR A NEW TRIAL

CLARIE, Chief Judge.

The plaintiff, Everlena Coleman, Administratrix of the Estate of Bobby Coleman, brought this civil rights action (42 U.S.C. § 1983) against Connecticut State Police Officer Karol Siedel, who fatally shot and wounded her late husband, Bobby Coleman, while that officer was in the performance of his official duties. After a jury trial, the plaintiff's estate was awarded $100,000 in general damages and $75,000 in punitive damages, for a total award of $175,000.

The plaintiff now seeks a new trial limited to the issue of the amount of compensatory damages, claiming that the jury's award was inadequate as a matter of law. The defendant, on the other hand, has moved, pursuant to Rule 59(c), Fed.R.Civ.P., that the Court set aside the jury verdict, and the judgment entered thereon, and grant a new trial. The defendant state police officer claims that the verdict was contrary to the weight of the evidence and was the product of mistake, passion or prejudice; he further represents that the Court erred by admitting into evidence alternative means of his approaching the decedent, in determining whether the officer's overall conduct on the occasion of this shooting violated the decedent's constitutional rights.

The Court denies the plaintiff's request for a new trial on the claim of the inadequacy of compensatory damages. The Court further finds that there is no substantial basis to support the defendant's claim that the jury verdict was founded on mistake, passion or prejudice; or that the Court erred by permitting into evidence expert testimony concerning the totality of the defendant's conduct and the alternative means available for approaching and confronting the plaintiff's decedent, under the circumstances then and there existing.

However, the Court grants the defendant's motion to set aside and vacate the award of punitive damages in the amount of $75,000. No material evidence was offered by the plaintiff to indicate in the slightest degree, that the state police officer, in motivation or action, dealt with the plaintiff's decedent maliciously, wantonly, oppressively or sadistically; nor was there any reasonable evidence from which the jury could infer such conduct. In other words, there was no evidence offered in the case which would support an award for punitive damages.

### Factual Background

On August 7, 1976, the plaintiff's decedent had stopped at the Sunoco Service Station on Route 72 in Cromwell, Connecticut. He was having car trouble at the time and his vehicle was on fire. Several members of the local volunteer fire department had responded to a phone call and appeared at the scene to put out the fire. Although their mission in extinguishing the fire was accomplished, the car was no longer operable. While the firemen were in the process of extinguishing the blaze, the fire marshal discovered a revolver which had dropped onto the floor of the car from underneath the dashboard. He also observed the decedent personally retrieve another, similar weapon from the car floor on the driver's side, which he, Coleman, then placed in the front waistband of his trousers. This act was carried out in full view of several fire department personnel at the scene. When the town fire marshal noted these handguns being retrieved from the vehicle, he thought it best to call the state police and advise them of the suspicious circumstances which had transpired.

Upon receipt of the complaint at the barracks, Officer Siedel, who was patrolling the highway in the territory, was dispatched by radio to investigate. He promptly responded by appearing at the service station. When Siedel arrived, several firemen were milling around the area and the fire marshal advised him about the

guns and that the plaintiff's decedent was carrying one pistol in the front waistband of his pants. The police officer was also shown the second gun which had been retrieved from the car by the marshal and was advised by the latter that a black man, Coleman, was, at that time, making a phone call from the public telephone booth in the yard of the service station.

The officer suggested that the firemen outside the station should move to one side away from the telephone booth area. Siedel then drew his service revolver, holding it out of view behind his right leg. When he had approached to within approximately twenty feet of the phone booth, he called to Coleman to come out of the booth. Coleman half turned and, when he saw the officer, he verbally responded to the effect that he was completing a telephone call and would be out shortly. He then turned back, facing the telephone, and appeared to reach into the front of his trousers. He hunched-up his shoulders while reaching into his frontal waistband in a manner which appeared to the policeman and several of the firemen to be a removal of the gun from the front waistband of his pants.

The officer called out to Coleman and ordered that he should come out of the phone booth immediately. Coleman appeared to slam the telephone receiver onto the hook and spin around suddenly to the right as he exited from the booth. When he did so, the door on the booth opened and, as Coleman turned, he thrust out his right arm toward the officer, while holding in his right hand a bright silvery object resembling a revolver. The police officer had already raised his weapon and was standing in a semi-crouched position, while aiming toward Coleman. As the latter appeared to point the shining object toward the officer, Siedel fired, wounding Coleman in the mid-chest.

Coleman fell backward as the bullet struck him and, his arms raised, he then fell forward onto the ground. He died almost immediately. Near the deceased's body was found what appeared to be a silver foil wrapper and a package of cigarettes. The officer turned the body over where he fell, but could find no revolver. He searched further and he did find the revolver on the floor in one corner of the phone booth.

### Discussion of the Law

The defendant officer has moved for a new trial claiming that the jury verdict was contrary to the substantial weight of the evidence and was without support in the evidence. He also contends that the evidence was contrary to the jury's finding that the defendant used unreasonable force in shooting Coleman or that he was grossly negligent in his handling of the confrontation. The claim is also made that the Court erred in admitting evidence concerning the totality of the circumstances at the scene of the incident just prior to the confrontation.

The plaintiff relied almost wholly on the testimony of the defendant officer and the volunteer firemen at the scene, for the presentation of the factual circumstances immediately preceding the shooting. The credibility of these witnesses and the weight to be given to their testimony is a matter solely within the province of the jury.

In the case of *Jacobs v. Goodspeed*, 180 Conn. 415, 429 A.2d 915 (Sup.Ct.1980), the Connecticut Supreme Court explained the distinction between the jury's responsibilities and those of the court:

"Although the trial court has a broad legal discretion in this area it is not without limits; one immovable limitation is the constitutional right of trial by jury. *Gosselin v. Perry*, 166 Conn. 152, 168, 348 A.2d 623 (1974); *Robinson v. Backes*, 91 Conn. 457, 460, 99 A. 1057 (1917). Because in setting aside a verdict the court has deprived a litigant in whose favor the verdict has been rendered of his constitutional right to have disputed issues of fact determined by a jury; *Rickert v. Fraser*, 152 Conn. 678, 681, 211 A.2d 702 (1965); the court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined. 'Upon issues regarding which, on the evidence, there is room for reason-

able difference of opinion among fair-minded men, the conclusion of a jury, if one at which honest men acting fairly and intelligently might arrive reasonably, must stand, even though the opinion of the trial court and this court be that a different result should have been reached.' *Horvath v. Tontini,* 126 Conn. 462, 464, 11 A.2d 846 (1940)."

The evidence developed on cross-examination disclosed that, several days prior to this trial, all of the firemen witnesses were assembled at the fire station to be interviewed together to review their expected testimony. Had the jury accepted their version, as well as that of the defendant police officer, of what had occurred, they might well have found that the facts supported a different and, in fact, a contrary result. One can only infer that they did not accept that testimony as depicting the true facts and drew their own conclusions from the overall physical facts. It would appear that one of the crucial factual questions was the finding of the handgun on the floor of the phone booth after the shooting, when the door of the booth was closed. Evidence was also submitted by the state police investigator, that no fingerprints or handprints belonging to Coleman were ever found on that gun.

The defendant officer portrayed in his testimony what he saw moments before, and simultaneously with, the confrontation. He said that as Coleman turned to exit the telephone booth, he held in his right hand a shiny metal object, similar to a nickel-plated handgun. The police officer, supported by the testimony of the firemen, saw Coleman raise his right hand with the gun, as if to aim it at the officer. He stated that he believed his life was in danger and responded in self-defense with one shot. After the shooting the officer examined the scene closely, looking for the gun. He looked under Coleman's body and could find none. Nearby was a silver colored tinfoil cigarette wrapper and a package of Parliament cigarettes. The jury could have chosen to believe that Coleman never actually held a weapon in his right hand at that moment prior to the shooting or that, if he did have a weapon, he never pointed it at the defendant officer. They could have also concluded that the shining object Siedel saw in Coleman's hand was only the silver tinfoil covering on the cigarette package, and that the officer mistook that for a shiny nickel-plated handgun, and in doing so failed to act as a reasonably prudent person would have done under the circumstances.

Thus, had the jury chosen to accept the latter version of the evidence, they could have disbelieved the defendant officer, and his firemen witnesses, and found that there was no legal justification for his use of deadly force. The circumstantial evidence of Coleman's raising and hunching his shoulders, while reaching into the front of the waistband area of his trousers, could have been a part of the innocent action of dropping the weapon down one pants leg onto the phone booth floor to avoid having an illegal weapon found on his person. The evidence disclosed that the gun in question was one which had disappeared from the assembly line at the Hi-Standard plant, where the decedent Coleman was regularly employed. Coleman had no prior criminal record; he had a wife and two children who he was supporting and with whom he was living. On the day of the incident, he was returning, alone, from an employee's picnic or outing.

The jury could have accepted the defendant officer's testimony and that of the firemen witnesses, as disclosing the true facts. An analysis of the physical evidence could readily have supported the circumstance that the gun was later found on the floor of the phone booth with its door closed. Even if it were believed that Coleman had pointed the shiny nickel-plated handgun at the officer moments before the latter shot him, the evidence disclosed that the officer's bullet struck Coleman in the chest. He fell backward against the corner of the phone booth, both arms dropped downward, and as his body came in contact with the folding door on the phone booth, it opened. This permitted the gun to drop from his hand onto the floor in the right hand corner of

the phone booth. Coleman staggered a step or two forward and then fell on his face, while moving away from the phone booth. As soon as the pressure was released from the exterior of the folding door on the telephone booth, it closed by reason of its balanced design so that the pistol remained on the floor inside the booth, where it was subsequently found.

If the jury had accepted this version of the actual happenings, then their conclusion could have resulted in a contrary verdict to that which was found at the trial. It is not a matter for the Court to decide what facts should have been believed in a jury case, as long as there are reasonable grounds for the jury to hold as they did. Were the Court to usurp unjustifiably this right, it would be depriving the plaintiff's decedent of his constitutional right. The Connecticut Supreme Court recently held in *Vetre v. Keene*, 181 Conn. 136, 139, 434 A.2d 327 (1980):

> "Litigants have a constitutional right to have issues of fact decided by the jury and our primary concern in reviewing the action of the trial court on a motion to set aside a verdict is to determine whether the court abused its discretion. *Hanauer v. Coscia*, 157 Conn. 49, 53, 244 A.2d 611. On the evidence presented, we decide only whether the jury could fairly reach the verdict they did since the credibility of witnesses and the weight to be accorded to their testimony lie within their province. The jury may accept a part of the testimony and disregard the remainder and the assessment of damages for the plaintiff's injuries is peculiarly a matter for the jury.

Since there were at least two separate but contrary versions of the respective claims of the parties, which the jury was at liberty to believe in order to justify support for its respective findings, it cannot be said with reasonable certainty that the jury's verdict on the issue of compensatory damages was contrary to the weight of the evidence or that it was arrived at as a product of mistake, passion or prejudice.

The plaintiff claims that, once liability was found, the amount of the award for compensatory damages was not adequate. The defendant, on the other hand, claims that the award of regular compensatory damages, plus punitive damages, evidences the jury's mistake, passion and prejudice. Recently, the Connecticut Supreme Court in *Josephson v. Meyers, Administratrix*, 180 Conn. 302, 312, 429 A.2d 877 (1980), spelled out the criteria for testing the correctness of such a verdict when it said:

> " ' "The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, mistake, or corruption." *Birgel v. Heintz*, 163 Conn. 23, 28, 301 A.2d 249; Maltbie, Conn.App.Proc. § 197.' *Thomas v. Katz*, 171 Conn. 412, 370 A.2d 978.)"

On that same date, in another similar case, it explained at considerable length its position on this question, when it said in *Pisel, Conservator (Estate of Carol Ann Pisel) v. Stamford Hospital*, 180 Conn. 314, 340, 430 A.2d 1 (1980):

> "First, the amount of an award is a matter peculiarly within the province of the trier of facts. *Angelica v. Fernandes*, 174 Conn. 534, 535, 391 A.2d 167 (1978); *Johnson v. Flammia*, 169 Conn. 491, 499, 363 A.2d 1048 (1975). Second, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. *Thomas v. Katz*, 171 Conn. 412, 416, 370 A.2d 978 (1976). 'The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, mistake or corruption.' *Birgel v. Harris*, 163 Conn. 23, 28, 301 A.2d 249 (1972); Maltbie, Conn.App.Proc. § 197. Third, the ruling of the trial court on the motion to

set aside the verdict as excessive is entitled to great weight and every reasonable presumption should be given in favor of its correctness. *Mansfield v. New Haven*, 174 Conn. 373, 375, 387 A.2d 699 (1978)."

On the issue of punitive damages, the defendant claims that the jury's verdict demonstrates that its action was the product of bias, passion, mistake or failure to understand the court's instruction to the jury. The defendant asserts that the overwhelming weight of the evidence established that the defendant did not act maliciously, wantonly or oppressively. The Court's charge on the question of punitive damages was as follows:

"The second type of damages which you may consider are punitive damages, which, as the name suggests, are designed to make an example of or to punish a wrongdoer. You will recall that the plaintiff has claimed punitive damages.

"If you find that the constitutional rights of the decedent, Bobby Coleman, were denied in any respect, you may consider whether the plaintiff has shown, by a preponderance of the evidence, that the acts or omissions by the police officer, which resulted in such denial were maliciously, wantonly, or oppressively done. If you find this to be the case, you may further consider whether the person responsible for such conduct should be required to pay a penalty, so that in the future others will be deterred from engaging in similar conduct.

"An act or a failure to act is 'maliciously' done, if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually, or toward all persons in one or more groups or categories of which the injured person is a member.

"An act or failure to act is 'wantonly' done if done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person.

"An act or failure to act is 'oppressively' done, if done in a way or manner which injures, or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another person.

"Whether or not you decide to award any punitive damages is entirely within your discretion. But you should keep in mind that you may only award punitive damages against a defendant if you find that the defendant engaged in one or more of the following: willful or malicious violations of the decedent's constitutional rights; or gross disregard of the decedent's constitutional rights; or reckless disregard by the defendant of whether or not he was violating the decedent's constitutional rights.

"Furthermore, in addition to considering the purposes for which punitive damages may be awarded, you must also bear in mind that the law requires that the amount of punitive damages, if awarded, must be fixed with calm discretion and sound reason, and must never be influenced by any sympathy, bias or prejudice with regard to any party to the case.

"If you do make any award of punitive damages, such damages may include, in your discretion, an allowance for reasonable attorney's fees for the bringing of this action."

Nowhere in the plaintiff counsel's summation did he argue or claim that Officer Siedel had acted with malice or that his actions were carried out with prejudice, ill-will, with spite or grudge, either toward Coleman individually or toward all persons in one or more groups or categories of which Coleman, a black man, was a member.

The plaintiff's counsel, when summing up in his closing argument, stated:

"All this lawsuit says is that on this night, on this occasion, this man didn't live up to the standard of care that we expect of police officers. He didn't live up to the training he had, to the experience he had.

"He was careless. He placed himself in a zone of danger, so that an ambiguous action on the part of another man caused him to fire his weapon and kill him. And that is what this lawsuit is about.

"Thank you."

■ The Court has carefully reviewed all the evidence in the case and finds no rational basis to support the jury's award of punitive damages to the plaintiff. It should be noted further that the Court's charge did advise the jury that if they did award punitive damages, they could include an allowance for reasonable attorney's fees. Yet, the plaintiff had offered no evidence of reasonable attorney's fees and the Court should not have permitted that issue to go before the jury. In doing so it invited speculation and guesswork to be injected into the deliberative process. Therefore, the Court vacates the award of $75,000 punitive damages and will suggest that the plaintiff make a separate application to the Court requesting an allowance of reasonable attorney's fees pursuant to 42 U.S.C. § 1983, supported by adequate affidavits and time sheet exhibits.

Finally, the Court rejects the defendant's claim that the Court erred in admitting evidence as to possible alternatives to the tactics used by the defendant in approaching the phone booth, and in charging the jury that the defendant could be found liable because of his choice of tactics. The defendant's objection to this evidence was on the ground that the "possible alternative" evidence was irrelevant.

■ A determination of whether the officer's actions were in good faith necessarily involves an inquiry into the need for the application of force. *Jones v. Marshall*, 528 F.2d 132, 139 (2d Cir. 1975). That "need" can only be assessed if the totality of circumstances surrounding the incident are reviewed against a backdrop of possible alternative police tactics. The evidence admitted was, therefore, relevant to the issue of the need to use deadly force.

After the post-trial motions had been argued, additional counsel filed a supplemental memorandum in behalf of the defendant in support of the defendant's pending motion for a new trial. In it he concedes that the new issue which he seeks to raise was not previously presented to the court or jury. It deals with a felony statute, Section 29–38 of the Connecticut General Statutes, which provides:

"any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29–28 or section 53–206, or has not registered such weapon as required by section 53–206, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both."

■ Counsel argues that probable cause existed for the arrest of Coleman at the time of the confrontation and that this issue should have been considered or treated by the Court in the jury charge. However, during the trial this was never presented. There was no evidence offered that Coleman had not been issued a lawful permit to possess and carry in his motor vehicle a pistol or revolver. Under the circumstances there was no reason to treat that subject in the jury charge and neither counsel requested it or raised such an issue. It is too late to inject that issue now.

The punitive damage judgment is vacated pursuant to the defendant's motion; in all other respects the plaintiff's motions and the defendant's motions are denied. The Court will consider an application for attorney's fees pursuant to 42 U.S.C. § 1983 with supporting affidavits and time sheet exhibits.

SO ORDERED.