[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a legal malpractice action brought by a corporation and three of its principals versus a law firm, two of its partners and an employee lawyer. The corporate plaintiff in this case is Beverly Hills Concepts, Inc. (hereinafter referred to as BHC), a Connecticut corporation which at all times pertinent to this case had its principal place of business in Rocky Hill, Connecticut. Charles Remington is a resident of the Town of Cheshire, Connecticut, and was the President of BHC and the owner of one-third of the issued and outstanding stock. Wayne Steidle is a resident of CT Page 252-RR the Town of Middletown and was a Vice President of BHC and the owner of one-third of the issued and outstanding shares of stock. Jeannie Leitao is a resident of the Town of Cromwell, Connecticut, and was a Vice President of BHC and the owner of one-third of the issued and outstanding shares of stock.
The defendants, Schatz Schatz, Ribicoff Kotkin, (hereinafter S S) is a partnership of attorneys-at-law having a principal office and place of business in the City of Hartford. The defendant Stanford M. Goldman, Jr., is a resident of the Town of Avon, Connecticut, and at all times pertinent to this case was an attorney-at-law and a partner of the defendant, S S. Ira Dansky, is a resident of the Town of Stamford, Connecticut, and at all pertinent times was a partner of the defendant S S and/or an attorney employed by said firm. The defendant, Jane Seidl, is a resident of the Town of Glastonbury, Connecticut, and at all pertinent times mentioned herein was an attorney employed by the defendant S S.
PLEADINGS
The plaintiffs have filed a complaint containing eight counts alleging negligence, breach of contract, intentional misrepresentation, negligent misrepresentation, breach of a CT Page 252-SS fiduciary duty, breach of a covenant of good faith and fair dealing and a violation of Connecticut Unfair Trade Practices Act C.G.S. § 42-110a et seq. (hereinafter CUTPA).
The plaintiffs allege that they had developed a unique and uniform system known as the Beverly Hills System for the establishment and operation of health and fitness facilities at which various types of physical fitness programs, diet programs and related products were offered for sale to members. They maintain that the "concept" was characterized by distinctive decor, design, and layout; distinctive salon operating methods, procedures and techniques; distinctive business operations, sales promotions and advertising; and also a trademark, tradename, signs and symbols. They allege that they had built a reputation, demand and good will for health and fitness salons and that they were engaged in the business of offering for sale and selling licenses and distributorships. They also allege that they had retained the services of S S who represented to them that they were experts in the franchising of businesses for operation on a nationwide basis. They also allege that unknown to them they were in violation of the Connecticut Business Opportunities Act, C.G.S. § 36-503 et seq, (hereinafter, the Act), at that time. The plaintiffs maintain that while S S represented them they expended thousands of dollars of their limited CT Page 252-TT financial resources for legal and accounting fees, design and printing costs, salaries for additional marketing and administrative personnel, consultants' fees and advertising commitments. On or about September 11, 1988, the office of the Banking Commissioner of the State of Connecticut notified BHC that it had committed repeated violations of the Act by its failure to file a registration and disclosure statement for the marketing and sale of licenses and distributorships for the BHC system. Because of these violations, they were forced to discontinue the offering and sale of licenses and distributorships and unable to sell franchises and as a consequence their business operations were brought to a halt and they became liable for substantial fines and they would have to offer recisions to the purchasers of their licenses and distributorships.
Plaintiffs allege that the defendants knew or should have known from the nature of the business revealed to them by the plaintiffs that the plaintiffs were in violation of the Act; that defendants should have so notified the plaintiffs and advised them to register and make a disclosure under the post-sale registration provisions of the Act and that failure to do so has caused substantial financial damage to the corporation and the individuals.
The plaintiffs maintain that these acts of defendants CT Page 252-UU including without limitation the failure to inform plaintiffs within a reasonable time after plaintiffs had engaged their services of the requirements of the act that there they were in substantial violation of same; that such violations created legal impediments to the offering and sale of business opportunities and franchises for the Beverly Hills system and the failure to take steps to effect the plaintiffs' compliance with the act constituted a breach of the duty the defendants had assumed under their agreement with the plaintiff to provide timely and correct legal advice to them and to do so with the same degree of care, skill and diligence that other attorneys in the State of Connecticut in the same line of practice would have exercised in similar circumstances. The plaintiffs maintain that as a consequence of the failure of the defendants to perform their aforesaid obligations with the proper degree of care, skill and diligence, they have been injured in the many ways outlined in the complaint and that their failure to act constituted legal malpractice.
In the second count of their complaint, the plaintiffs allege that the aforementioned acts of the defendants, S S including without limitation their failure to inform plaintiffs within a reasonable time after their engagement of the requirements of the act that they were in violation of same and that these violations created legal impediments to CT Page 252-VV the offering and sale of business opportunities to franchisees and the failure of the defendants to take steps to effect BHC' compliance with the act constituted a breach of the duty the defendants had assumed under their contract to provide timely and correct legal advice with respect to its business and that as a result of the failure of the defendants to perform the duties which they had assumed under their contract the plaintiffs were injured.
In the third count of their complaint the plaintiffs allege that the defendants' many representations, recommendations and statements to the plaintiffs (e.g. their expertise in the registration of franchises) were inaccurate, false and misleading and that by virtue of their having recklessly or negligently made these inaccurate, false and misleading representations, recommendations and statements, they were induced to enter into an attorney-client relationship causing them to act to their detriment in reliance upon the advice given by the defendants; that they conducted their business in accord therewith and undertook a franchising program which could not be used by them; that they engaged the services of accounting firms and other professionals and incurred unnecessary and substantial fees and otherwise acted to their serious detriment.
In the fourth count the plaintiffs allege that the CT Page 252-WW defendants knew or should have known that their negligent or reckless failure to ascertain and/or disclose information which was vital to the business and well being of plaintiffs would likely cause substantial harm and financial losses and in fact did so.
In the fifth count the plaintiffs allege that the defendants realized that the quality and nature of their legal services were not in accord with either the prevailing standard in the legal community or the obligations and standard of care imposed by their contract for services and that the defendants acting individually or in concert sought to terminate the attorney-client relationship in order to avoid or minimize their exposure to potential legal action and that in their letter of termination, the defendants intentionally gave false and misleading reasons for the termination and intended to conceal the true and underlying reasons motivating them and that the defendants knew or should have known that by their failure to disclose to the plaintiffs the true reasons for seeking to terminate their relationship they were likely to cause additional financial loss to plaintiffs and in fact did so.
In the sixth count, the plaintiffs allege that the acts and omissions of the defendants referred to in prior counts CT Page 252-XX constitute breaches of their fiduciary duties and obligations to the plaintiffs and as a result of these acts the plaintiffs have been injured.
In the seventh count, the plaintiffs allege that these acts and omissions referred to above constitute a breach of the covenant of good faith and fair dealings resulting in injury to the plaintiffs.
In the eighth count, the plaintiffs allege that the aforesaid acts of the defendants constitute violations of Connecticut Unfair Trade Practices Act C.G.S. § 42-110a et seq.
The defendants have filed an answer in which they have denied all of the operative allegations of the plaintiffs.
FACTS
After a lengthy trial, extremely well presented by both parties, numerous exhibits, substantial briefs with voluminous appendices, most of which have been examined and in some cases re-examined, the court makes the following finding of facts.
The plaintiffs, Remington, Leitao and Steidle, began business as Beverly Hills Concepts, Inc., with a Massachusetts CT Page 252-YY corporation which was incorporated in April of 1987. They sold private label physical fitness equipment manufactured with a distinct color scheme and logo, and the "Beverly Hills Concepts Systems" for operating a fitness salon primarily for women.
Each of these principals had extensive backgrounds in the fitness industry. Remington had owned an interest in at least two tanning salons prior to BHC. Leitao had been operating a fitness center in Rocky Hill and Steidle had been in the business of selling tanning and toning equipment. Even after the demise of BHC, Remington and Steidle have remained in the fitness industry. Remington has developed a nutritional weight loss program and has appeared as a panelist on national TV shows and Steidle is currently the owner of a successful World Gym Fitness Center in Florida.
The system created by the individuals covered everything from advertising and promotion of BHC clubs to basic daily club operations. The corporation provided a comprehensive and professional package of equipment, training and sales and marketing support, furnishing practically everything a fitness club owner would need.
On August 17, 1987 BHC incorporated in Connecticut and CT Page 252-ZZ established a corporate headquarters in Rocky Hill which contained a BHC salon, showroom and corporate offices.
The corporation had had some difficulty in California due to failure to have a trademark and on August 1, 1987 Leitao traveled to Washington, D.C. where through counsel she, on behalf of the corporation, made an application for a federal trademark for BHC. During the summer of 1987 BHC developed an extensive sales, marketing and operational training program assembling sales, marketing and operation manuals and producing master advertising "slicks" and promotional materials. It also licensed purchasers to use the Beverly Hills Concepts name and logo in their clubs. They promoted the "concept" in print media, radio ads, brochures and interviews and in various health and fitness magazines. They offered licensees, in addition to the above mentioned material; training in selling and keeping memberships and in basic principles of fitness and nutrition. They provided floor plans, daily salon operation checklists and master membership forms and appointment sheets. BHC produced various materials used in formal classroom training sessions conducted at their Rocky Hill, Connecticut, headquarters and they held at least one distributors' meeting there.
BHC established two basic channels for distribution. CT Page 252-AAA First, they sold directly to investors who wished to open a fitness center using the Beverly Hills Concept name and system. By July of 1987 it also began selling distributorships on a national basis. These distributors were given a territory in which they had the exclusive right to sell Beverly Hills Concepts products and to sub-license its name.
Each distributor was required to have its own operating fitness center which also served as a showroom for other potential club owners and these distributors were supplied with a distributor marketing support package including all of BHC manuals and marketing materials. Under the terms of the distributor agreements, the distributors could sell equipment packages directly to persons interested in starting fitness centers and these people would receive a license to use the BHC name and logo.
A BHC licensee purchased the equipment package and also received at no extra cost an owner's package similar to the distributor's package.
The BHC System received such a response in the marketplace, that Malinowski, a BHC Massachusetts' distributor, from the summer of 1987 through mid-1988 was CT Page 252-BBB unable to keep up with the volume of sales leads from prospective purchasers and from prospective customers who wished to join his BHC fitness center. Rosconi, the national sales manager, was overwhelmed with inquiries from potential fitness center owners. Pam O'Brien, former marketing director, also considered BHC marketing efforts to be quite successful.
A concern over the California trademark issue led BHC to seek appropriate legal advice, so in late October, 1987, Jean Leitao contacted the law firm of Schatz Schatz, Ribicoff 
Kotkin with a view to retaining this firm as counsel. On October 28th plaintiffs met with defendants, Goldman, who is a partner in S S and Jane Seidl a young associate lawyer. They met at Schatz's Hartford office and discussed BHC's business plans and the legal guidance it needed. At this meeting Leitao advised Goldman and Seidl that she had recently traveled to Washington, D.C. to file a trademark application for the name "Beverly Hills Concepts." Goldman was not familiar with intellectual property law nor the trademark registration process and he and Seidl incorrectly assumed from their discussion that BHC had a "federally registered trademark" and he assumed that BHC would not be required to register itself as a "business opportunity" under the Connecticut Business Opportunity Investment Act. At this CT Page 252-CCC stage, no effort was made by the law firm, Goldman or Seidl to verify the status of the BHC trademark. Verifying the status of the trademark would have been a simple operation.
Goldman represented that S S was well qualified to handle BHC's legal affairs. BHC indicated to Schatz its intention of franchising and Goldman claimed expertise in franchise matters, using as an example his long standing relationship as counsel to the Dairy Mart Company. He used the Dairy Mart franchise agreement as an example of the high quality work which his firm performed.
The plaintiffs had indicated their desire to move as rapidly as possible toward franchising and were assured by Goldman that Schatz would proceed expeditiously and he estimated about a six week completion period. Goldman represented that he would be personally involved in the matter and that his firm had the expertise to handle a national franchise program and also the ability to open doors to investors and financing sources.
A note from Schatz's files dated October 28, 1987 (Exhibit 40) indicates that S S was aware that BHC's business was similar to franchising; that it was selling its name and equipment plus materials and marketing help and CT Page 252-DDD support; that BHC had both a Massachusetts and Connecticut corporation and was having problems with advertising in California.
On November 3, 1987 Goldman and Seidl visited BHC's facilities in Rocky Hill for the purpose of gathering more information about BHC's business operations. Goldman and Seidl examined copies of BHC's distributor and licensing agreements and promotional materials and the sales, marketing and operation manuals.
Despite a request by BHC for guidelines for interim sale of equipment and its "system" before registration of the franchise (Exhibit 41), Schatz did not furnish such information nor did they express any concern regarding BHC's present operations or advise any change in the manner in which they were selling equipment packages.
The defendants suggested that BHC engage a "Big Eight" accounting firm to prepare the financial statements required for the franchise documents and offered to introduce them first to Coopers Lybrand.
Schatz arranged a meeting between BHC and Coopers 
Lybrand (hereinafter Coopers) whereupon BHC hired Coopers for CT Page 252-EEE its accounting work in mid November. The defendants advised Coopers as to the level of financial statement needed for the franchise documents but based their advice only on the FTC rules and ignored the Connecticut Act's requirement. Coopers rendered a 1-31-88 financial statement but was never paid for its work. The total balance due was $31,588.44.
Despite his representation that he would give the matter his personal attention, Goldman almost immediately turned over the vast bulk of the work to Seidl, a junior lawyer, and to Dansky, a "contract" lawyer who was not as yet admitted to practice law in Connecticut and lacked experience in franchising and business opportunity law. (Dansky received a fixed salary but was held out as a partner of the firm.) While for all practical purposes, the file was turned over to Dansky as a senior member of the firm, he, in his mind, assumed no responsibility for legal or compliance issues in the franchise area. This turning over responsibility took place in December of 1987. The billing records of S S indicates that from December 22nd through June of 1988, Goldman recorded only about 2 hours of time devoted to BHC files.
When Goldman examined the materials at the time of the November 3rd meeting at the BHC headquarters, he commented CT Page 252-FFF that some of their advertising claims were a bit too aggressive. Goldman understood that the principals told him that they were selling only exercise equipment and dietary supplements and that they granted purchasers a license to use the Beverly Hills Concepts name and charged no fee for the license. Goldman analyzed whether BHC was offering business opportunities and took into account the fact that the distributor agreement contained language regarding sales and marketing assistance but he regarded that language as promising to provide sales aids to assist a distributor in selling the equipment. He told Charles Remington that in his view it was a "gray" area as to whether BHC was offering business opportunities. Initially, however, he was not concerned with whether or not BHC was selling business opportunities because he assumed the plaintiffs had a trademark which would exempt BHC from the Connecticut Act.
On December 9, 1987 S S had sent to BHC a first rough draft for discussion purposes of a franchise agreement to be included in the registration document.
In mid-January of 1988 Seidl, who had begun drafting BHC's franchise documents in December, sent drafts of an independent operator's agreement and franchise offering circular to BHC's principals for review. CT Page 252-GGG
Financial statements prepared by Coopers Lybrand became available in late January or early February of 1988.
In February some S S associates had been assigned to research the federal franchise disclosure and franchise registration requirements for fourteen states, including Connecticut. On February 8, 1988 Alan Levin, a S S associate, met with Seidl to discuss his research part of which outlined the requirements of the Connecticut Business Opportunities Act and the Act's exemption for sellers of business opportunities. In the margin of Mr. Levin's notes was a statement "no exemption." On the same day, February 8, 1988, defendants contacted BHC's trademark attorney in Washington, D.C. and confirmed the fact that BHC's trademark application was still pending and no federal registration had been issued. This was the first recognition by S S lawyers that there was in fact no exemption which applied to BHC under the Connecticut Act. No one from the defendants' office informed the plaintiffs that they had no exemption and were required to register under the statutes.
Despite Goldman's representation that the work would be completed, it was incomplete by mid-February at which time BHC hired Paul Stewart of Franchise Associates, Incorporated, CT Page 252-HHH (hereinafter FA) (a franchise consulting firm) to assist defendants in preparing the franchising documents. He examined them and concluded that the documents prepared by Schatz thus far had been competently prepared from a legal point of view but he recommended to counsel that he be authorized to reformat the material into a uniform franchise offering circular (UFOC) format instead of an FTC format and to rewrite a more saleable set of documents. The rewrite was accomplished and the documents were ready to be filed in Connecticut and elsewhere in May.
In February, Dansky, being unfamiliar with the requirements of the Connecticut Business Opportunities Act advised the plaintiffs to merge their Massachusetts and Connecticut corporations keeping the Connecticut corporation as the active entity. The transfer agreement was signed in March of 1988. Massachusetts has no business opportunities laws and BHC could have operated under the Massachusetts corporation until they registered under the Connecticut law and thus curtailed their continuing violations of the Connecticut Business Opportunities Act.
During April, BHC provided checks for filing fees in Illinois and Michigan and executed an exemption from the Texas Business Opportunities Investment Act with the assistance of CT Page 252-III S S.
On April 25, 1988, S S through Dansky rendered a billing memorandum to BHC. (Exhibit 24) This contained a reduction in the fee by $11,000 that Dansky felt was for "educational matters". On June 2, 1988 Dansky sent a letter to BHC terminating their representation stating that he was concerned that the January 31, 1988 financial statements presently contained in the offering material might show a stronger financial position of BHC than would be the case if April 30th and May 31st financials were used, together with what he took to be the corporation's decision not to supplement the franchise offering documents with updated financial statements. Dansky showed no recognition in this letter of the Connecticut Business Opportunities Act requirements re business operations. Schatz continued to provide legal services for many weeks after Dansky's termination letter. Schatz's total bill of $37,610.81 remains unpaid.
On or about June 8, 1988 BHC retained Attorney Martin Clayman of Clayman, Markowitz Tapper (hereinafter "Clayman" to complete the registration. The BHC principals provided their new lawyers with S S's and Paul Stewart's work product which were available for use by them when in June 1988 they CT Page 252-JJJ prepared an application to register BHC under the Connecticut Act.
In a letter dated June 8, 1988 BHC was notified by its Washington trademark counsel to the effect that the trademark appeared to be entitled to registration and that if there is no opposition, it should be approved in approximately 3 1/2 months. On June 17, 1988, Clayman and his partner, Holly Abery-Wetstone, prepared an application to register a business opportunity in Connecticut which they sent to BHC with a booklet entitled "Additional Disclosures Required by the Connecticut Law" and requesting that the documents be signed and a check for $200 made payable to the Banking Commissioner be returned to them. BHC decided to hold off filing the application for registration awaiting the approval of the trademark registration.
In the meantime, by letter of September 15, 1988 BHC was contacted by Margot T. O'Grady, acting for the Banking Commissioner, advising that it had come to her attention that BHC may be in violation of the Business Opportunities Act. (She had seen one of their ads in a magazine). BHC immediately contacted Clayman and began to prepare a post-sale registration for BHC's previous sales. In a letter of September 16, 1988 Holly Abery-Wetstone requested a CT Page 252-KKK considerable amount of information necessary to prepare this document and also notified BHC that "you must cease all advertising and all franchise sales temporarily. I am hopeful that this problem will be resolved quickly and Beverly Hills Concepts will soon be selling franchises." BHC immediately halted all further sales.
During the summer of 1988 plaintiffs had been seeking further financing in order to pursue their franchise sales and on August 15, 1988 had entered into a letter of intent to merge BHC and Applied Technologies Systems, Inc. (ATS). Bob Lerman, the investment banker who put together the proposed merger, believed that it would have resulted in the exercise of warrants for the purchase of BHC stock which would have generated in excess of 1.2 million for BHC's operations. In addition, BHC's principals would have received stock in the merged company which would have been worth in excess of 11 million at the time the warrants were exercised. This merger was put on hold and ultimately cancelled as of March 3, 1989 because of the potentially severe penalties which could result from the Banking Commissioner's pending investigation.
On December 7, 1988 BHC filed a post-sale registration application as provided for by the Act. In conjunction with this, they retained the services of Touche-Ross Accounting CT Page 252-LLL firm to prepare an audited financial statement.
BHC came to the conclusion that the Banking Commissioner would force it to offer a right of recision to purchasers whose sales violated the act and with the need to disclose to future purchasers numerous violations of the act, it would be unable to continue in business and did not complete the post-sale registration and thus cancelled the audited financial statement being prepared by Touche-Ross. Touche-Ross was not paid for its work.
On June 28, 1989 the Banking Commissioner issued a formal cease and desist order and a notice of intent to fine up to $10,000 for each sale made in violation of the Act's requirements. He then issued a stop order denying effectiveness to BHC's post-sale registration and proceeded with hearings which were conducted in September and November of 1989 and May of 1990. In an order issued June 26, 1991 the Banking Commissioner found that BHC had repeatedly violated the Act by selling unregistered business opportunities within and from Connecticut during 1987-1988 and issued a final cease and desist order.
Schatz's files relating to the BHC matters contained much information which clearly showed that BHC was selling business CT Page 252-MMM opportunities. For example, a certain newspaper clipping of a BHC advertisement bearing a copyright dated 1987 in which BHC explicitly stated that it was offering a "business opportunity" for sale. (Exhibit 16c.) Brian Wolfe, the defendant's liability expert witness, and the defendants themselves in their brief finally admitted that throughout the pertinent period BHC was selling business opportunities in violation of the Act and did not have a "federally registered" trademark.
Goldman represented to BHC that he would be in charge of the file and yet he devoted only approximately 4 hours to same and attempted to pass off the responsibility to Dansky. Dansky, however, made no effort to familiarize himself with the areas of business opportunities or franchise law and viewed his role as limited to providing advice in the areas of general corporate matters and capitalizing. Seidl, a junior associate, was assigned to actual preparation of the documents for the franchises. All documents drafted by her were supposed to be reviewed by a partner but were not.
Despite claims to the contrary, BHC was never informed by either Schatz or Clayman that it was in violation of the Connecticut Business Opportunities Act until it was notified by the Banking Commissioner's Office in September of 1988. CT Page 252-NNN Nor was it aware until then of the severe consequences of violation of this Act. The principals of BHC were also not aware of the very important difference between having a "trademark" and having a "federally registered trademark."
The principals of BHC had put all their earnings back into the corporation.
There is no doubt the corporation owed substantial sums but it was also successful in selling its products in 1987 and 1988.
INDIVIDUAL PLAINTIFF
Having heard all of the evidence in this case the court is now of the opinion that the individual plaintiffs have no standing to maintain this action. In the opinion of the Court S S represented the corporation and not the individual shareholders. Although the affairs of the shareholders were inextricably interwoven with the affairs of the corporation, this is a situation not at all unusual in cases of a closely held corporation such as this.
At most the defendants represented the individual for a limited time while transferring their stock to the corporation CT Page 252-OOO but the fact remains that the principals as officers of BHC went to Schatz for advice on franchising and were primarily acting on behalf of the corporation.
A claim of injury the basis of which is a wrong to a corporation may be brought only by or on behalf of the corporations nd not by its shareholders to recover on their own behalf. Yanow v. Teal Industries, Inc., 178 Conn. 262,281 (1979); Fortini v. New England Log Homes, Inc., 4 Conn. App. 132,135 cert. dismissed, 197 Conn. 801 (1985); Vincel v.White Motor Corporation, 521 F.2d 1113, 1118-20 (2d Cir. 1975). Claims of the plaintiff shareholders as individuals are dismissed on the ground that the court lacks subject matter jurisdiction. Christ-Janner v. A. F. Conte and Co.,8 Conn. App. 83, 88-90 (1986). Even if it were found that the defendants represented the individuals, there is insufficient evidence produced for the court to arrive at any logical judgment as to the damages to be awarded the individuals. Henceforth the court will refer to the plaintiff corporation in the singular.
LEGAL MALPRACTICE
The plaintiff argues that the defendants are guilty of malpractice in that they failed to meet the standards of a CT Page 252-PPP reasonably competent attorney practicing at the time of the alleged incidents because they failed to recognize that the plaintiff was engaged in selling business opportunities at the time it first approached the defendants; defendants failed to ascertain at the outset that the plaintiff did not have a federally registered trademark; they failed to advise the plaintiff of the serious consequences of its acts and that it should cease further operations and become registered in Connecticut and that these failures led to the closing down of the business with substantial loss to BHC.
The defendants deny the allegations of the plaintiff's complaint and maintain that they relied upon the statements of the plaintiff that its trademark was registered and that it was therefore exempt and that based upon its representations to Goldman, the company was selling only physical fitness equipment and vitamins, etc., but not business opportunities and that in any event any activities by the defendants or lack of activity by them was not the cause of the plaintiff going out of business or any damages resulting therefrom.
Each of the parties presented an expert witness on the subject of liability for legal malpractice in Connecticut. The defendants from their opening statements through their trial presentation were obviously impressed by and relied CT Page 252-QQQ heavily upon the representations by former Banking Commissioner, Brian Woolf, also a Connecticut attorney-at-law, that he had written the business opportunity act and had considerable experience in that area of the law. The testimony of this witness fell far short of assisting the defendants in their presentation. From the point of view of credibility and experience, the court found his testimony to be unreliable. While it is true that he had administered the act as Banking Commissioner through the Banking Department and its staff, he was forced to admit that his representations that he had drafted the statute were untrue. Woolf claimed authorship of the Act while working as an assistant to Banking Commissioner Neiditz. He also claimed that he appeared at various legislative committee hearings in support of the Act's passage. Confronted with the legislative history of the Act, he changed his testimony to state that he was at the elbow of Mr. Neiditz when the Commissioner testified and that he "wrote" the Commissioner's testimony for him, a conveniently, unverified act. Woolf had never practiced before the Banking commission in the area of business opportunities before or after his tenure as Banking Commissioner and while on the stand, he was forced to concede that from the information available to Goldman, he should have recognized that BHC was in violation of the Act.
Woolf, in earlier deposition testimony and for a while at CT Page 252-RRR trial, maintained that the distributor agreement which Goldman had reviewed did not describe a business opportunity because the distributor was not required to do anything other than to purchase equipment and BHC was not required to do anything other than sell equipment. However, when confronted with the provisions of the agreement that require that BHC provide distributors with promotional, sales and technical information; that BHC advise distributors regarding pricing standards; that BHC would furnish field training and merchandising assistance on a national level and expressly requiring the distributor to participate fully in these programs, he conceded that the agreement described a business opportunity within the meaning of the Act. With reference to a certain brochure which Goldman acknowledged having seen, Woolf first considered it to be a gray area but later admitted that it described a business opportunity when he was shown that the brochure made representations of potential for income and gave detailed descriptions of the sales and marketing programs to be provided. He even testified that if this were his client he would unquestionably have registered it immediately. This was the brochure that had the quotation "hottest investment opportunity of the 80's". (Exhibit 16A)
The plaintiffs' expert witness, Harold Brown, is an expert in the field of franchise and business opportunity law. CT Page 252-SSS He has been practicing law as a member of the Massachusetts bar for over 50 years and is well qualified from the standpoint of scholarly analysis and practical experience. He has written extensively on franchise law, having written at least 300 articles based upon the fact that he has written an article per month for the New York Law Journal for the past 30 years. He has written more than 10 books on the subject and has represented thousands of franchisees and franchisors in practice. He also was instrumental in the formation of the American Bar Association Franchise Law Committee and has worked with the NASAA Franchise Committee.
He showed a complete understanding of the standards by which an attorney's conduct should be judged in a legal malpractice case in Connecticut.
Mr. Brown testified that in his opinion the issue of whether BHC was offering business opportunities was a matter of black and white and not gray. He further testified that the defendant's failure to recognize that the trademark exemption did not apply constituted professional negligence and that negligence was also evident from the testimony and billing records showing that Goldman did not give appropriate attention to this matter and did not properly supervise the junior lawyers. He indicated that the defendants should have CT Page 252-TTT realized that the issue of registration under the Act was an urgent matter given the severe potential consequences and that they were negligent in their failure to advise the plaintiff of these severe consequences.
In his view, if Goldman advised the client that BHC's operations only fell into a gray area, Goldman was negligent because it clearly was not a gray area and he was also negligent because he did not give BHC enough information to fully appreciate the potential damage that the business faced if found in violation of the Act. He concluded that the defendants' failure to recognize that BHC should have been registered as a business opportunity under the Act was unreasonable and breached the duty of care owed to clients. he also believed that the defendants' failure to recognize the urgency and their failure to act with the "alacrity" and "celerity" required constituted malpractice.
He also concluded that defendants' malpractice caused damage to the plaintiff and that it put BHC in jeopardy of the adverse consequence of failure to register under the Act and thereby deprive it of any reasonable chance for its business to succeed. The court was impressed with Mr. Brown's qualifications and his testimony.
It is well established in Connecticut that legal CT Page 252-UUU malpractice is the failure of one rendering professional services to exercise that degree of skill and learning, commonly applied under all circumstances in the community by a prudent member of the legal profession with the result of injury, loss or damage to the recipient of those services.Davis v. Margolis, 215 Conn. 408 (1990).
It is the opinion of this court that the defendants Schatz, Goldman, Dansky and Seidl were guilty of malpractice in their representation of BHC. In the opinion of the court, the representation by the defendants was below the standards of competent attorneys in the area and was a substantial factor in bringing about the demise of BHC and consequent financial loss.
Goldman represented himself as an expert in the field of national franchising and used Dairy Mart as an example of his expertise. In Connecticut, a state that has no separate franchising law, one must be knowledgeable of the Business Opportunities Act and all of its ramifications in order to act as an expert in franchising law. In the opinion of this court Goldman should have verified immediately whether or not the plaintiff had a federally registered trademark. From all of the information made available to him by the plaintiffs, Goldman should have recognized that BHC was engaged in the CT Page 252-VVV selling of business opportunities in violation of the Connecticut Business Opportunity Act. He should have immediately applied for a post sale registration and made every attempt to minimize any fines, penalties, etc., based upon any violations to date. In so doing, he should have immediately cautioned the plaintiffs as to their liabilities, and the very severe consequences and urge them forthwith to cease any further violations until such time as they were registered.
It is the opinion of this court that if the defendants had recognized the need to register BHC as a seller of business opportunities and had properly assisted the plaintiff in effecting a registration, the plaintiff would never have suffered the severe adverse consequences of failure to register which were imposed by the Department of Banking and which caused the demise of its business.
It is noteworthy that very substantial evidence that the plaintiff was engaged in the selling of a business opportunity was available to the defendants in their own files.
If proper attention had been given to the fundamental provisions of the Act and proper supervision maintained over the attorneys working on the file, a competent attorney, CT Page 252-WWW acting in this field, should have no question but that BHC was operating in violation of the Act. claims by the defendants that Goldman analyzed the situation and declared that BHC was operating in a gray area was, in the face of the overwhelming evidence available to him, only further evidence of incompetence.
Having indicated approximately six weeks in order to complete the project but taking over six months to do so, without any recognition of the true status of the plaintiff with reference to the Act aggravated the degree of negligence and rendered the plaintiff's situation more hopeless.
Considering the serious consequence of the violation of the Act, a violation of which was a felony and which provided for severe criminal and civil penalties, including fines, imprisonment, cease and desist orders, and compelled offers of recisions to all purchasers of business opportunities, a competent attorney in the area in which defendants claimed to have had expertise, should have had more complete knowledge of the process of registering a trademark with the federal government. They should have been aware that the mere filing was not sufficient. Both plaintiff's and defendants' legal expert witnesses recognized that goldman should have had the basic knowledge of trademark law required to evaluate whether CT Page 252-XXX BHC qualified for the Act's exclusions of a company with a trademark "effectively registered under Federal law" and that it would have been a simple matter to verify the status of BHC's trademark and that Goldman should have taken such basic steps.
Indeed, the very language of the statute, "effectively registered under federal law", should be enough to put any competent attorney on his guard that a layman might not appreciate the significance of the language and thus cause him to check carefully. It is also significant that checking on the status of the trademark was no more difficult than a telephone call.
DAMAGES (CAUSATION)
The standard of proof in a legal malpractice case is a fair preponderance of the evidence which evidence, however, must be established by expert testimony coupled with circumstantial evidence where appropriate.
"We have but one civil common law standard of proof for the recovery of damages in negligence, that is, a fair preponderance of the evidence. Coburn v. Lenox Homes, Inc.,186 Conn. 370, 372, 441 A.2d 620 (1982); see also 2 CT Page 252-YYY Restatement, [(Second), Torts], § 328A, comment (a); W. Prosser W. Keeton, [Torts (5th Ed. 1984)] § 389, p. 239." Stewart v.Federated Dept. Stores, Inc., 234 Conn. 597, 608, 662 A.2d 753
(1995). "A jurisdiction's normal standards for determining the sufficiency of the evidence also governs in a legal malpractice action." — ordinarily a preponderance of the evidence. Legal Malpractice, 4th Edition by Mallen and Smith, section 32.10; West Publishing Co. 1996.
To succeed in a legal malpractice action, "the plaintiff must produce expert testimony (1) that a breach of the professional standard of care has occurred, and (2) that the breach was the proximate cause of the injuries suffered by the plaintiff." Somma v. Gracey, 15 Conn. App. 371, 374-75,544 A.2d 668 (1988). "Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under al the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services." Davis v.Margolis, 215 Conn. 408, 415, 576 A.2d 489 (1990).
Expert testimony and circumstantial evidence can both be used in establishing legal malpractice. Expert testimony is treated the same way in legal malpractice cases as in medical CT Page 252-ZZZ malpractice cases. Precedent in both types of cases is relevant. Evans v. Warden, 29 Conn. App. 274, 281 (1992);Somma v. Gracy, 15 Conn. App. 379-380 (1988); Pearl v. Nelson,13 Conn. App. 170, 173 (1988). A case by case analysis is employed in such cases to determine the need for expert testimony. Evans at page 281. Puro v. Henry, 188 Conn. 301,305 (1982). Generally expert testimony is required "when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." Latham Associates, Inc. v. William Raveis Real Estate, Inc.,218 Conn. 297, 301 (1991).
"Causation may be proved by circumstantial evidence and expert testimony." Pisel v. Stamford Hospital, 180 Conn. 314,340 (1980); Slepski v. Williams Ford, Inc., 170 Conn. 18, 22
(1975); Shelnity v. Greenberg, 200 Conn. 58, 66 (1986).
In Pisel the court held that so long as the injury actually suffered is of the general nature which was foreseeable, "it need not be foreseeable that a particular person is hurt or an injury would result in any one particular manner." The economic injuries which occurred as a result of the defendants' negligent representation were of the type that were natural and foreseeable consequences.
The "substantial factor" test which is the generally CT Page 252-AAAA accepted standard of proof of causation applies in legal malpractice cases.
In Grace Yson v. Wofsey, Rosen, Kweskin Juritansky,231 Conn. 168, 182 (1994), the court states: "the test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries."
The court is of the opinion that the "substantial factor" test applies in this case in arriving at a decision as to causation. The inept legal representation, inordinate delays in completing their work and the fundamental failure to recognize BHC as a seller of business opportunities were, as claimed by the plaintiff, substantial factors in causing damage to the plaintiff and this damage, the forced closing of the business was a natural and foreseeable consequence of the defendants' neglect and incompetence.
The defendants maintain that BHC's demise was inevitable and was caused by a host of factors that had nothing to do with Schatz and that BHC got into trouble with the Banking Department not because of S S but (1) because of BHC's activities before it came to Schatz and (2) because BHC's principals made a conscious decision to continue to offer to CT Page 252-BBBB sell business opportunities and franchises when they knew that by doing so without registering they would be breaking the law, and (3) because BHC was unable to provide Attorney Avery Wetstone with the financial and other informations she needed to register BHC and satisfy the Banking Department.
The defendants maintain that BHC was in "a downward spiral" almost from its inception and was "unable to sell even one franchise despite its national advertising and solicitation program from April 1988 to its demise in March of 1989." The defendants maintain that this is a case of "misplaced blame" and that the business did not fail because of anything that S S did or did not do, but because the principals lacked the "integrity and experience" needed to operate any business successfully.
They further maintained that the principals were also too "undisciplined" and too "arrogant" to follow the advice of any of the professionals they hired and they claim that BHC's business records were "in such a shambles that the principals could not get Holly Avery Wetstone the documents and other information she needed to register BHC in a timely fashion."
The record shows that all of the documents necessary for the post sale registration were furnished to Holly Avery CT Page 252-CCCC Wetstone except for the audited financial statement and that any delay in furnishing the required information was due to the negotiations with the Department of Banking as to the scope of the recision order. The Department of Banking wanted her to disclose everything, e.g. all sales made no matter when, where or to whom, whereas Wetstone challenged the jurisdiction of the Banking Commission in this area. Several drafts of the explanatory statement and offer of recision had to be made by Wetstone in order to satisfy Margot O'Grady's demands.
An audited financial statement was required for the post-sale registration only because it had not been registered in a timely manner. Under the Act, an audited financial statement is required only after the first year of the company's operation. It would not have been required during the term of S S's representation. Had Schatz properly represented BHC, and requested a "review level" statement from Coopers Lybrand in 1987 and completed the registration recognizing the urgency of the matter, BHC would not have been in the position it found itself at the end of 1988.
While it is true that the audited financial statement was not furnished, the evidence indicates that a decision was made not to complete the audited financial statement because it was CT Page 252-DDDD determined that the situation with the Department of Banking was hopeless and the intended merger with ATS had collapsed. It would have been a useless statement according to Harold Brown.
The defendants' oft-repeated derogatory assertions about BHC's records, such as being in a shambles, is unsupported in the testimony of the financial professionals. Mark Kershaw, the manager assigned by Coopers Lybrand to BHC's accounts stated that BHC's records were in a condition which was not "untypical" for a relatively new company. He testified that BHC did have certain controls including a "one write accounting system" and kept bank statements, deposit slips, invoices and things of that nature. Bob Hager who became their financial manager stated that BHC had cash receipts and disbursements journals and documentation of receipts and license fees that were well maintained. Jim Ramos of Touche-Ross testified that BHC had records of general entry available to be compiled into a general ledger. Most of the above testimony agreed with that of C.P.A. Tom Ferreira, plaintiffs' expert on damages, to the effect that having financial controls in place was not critical during the early years of a business. While there is no doubt that the financial records of the plaintiff could have been improved upon, their condition was not a substantial factor in the demise of the CT Page 252-EEEE company or in the corporation's dealings with the Banking Department.
The defendants make the claim that plaintiff was attempting to sell franchises and business opportunities from April of 1988 until the demise of the corporation and were unable to sell a single franchise because the market for its equipment had disappeared. There is no evidence whatsoever that the market for the plaintiff's products had disappeared. In response to the claim that the plaintiff had been trying to sell franchises and was unable to do so, the plaintiff points out that by the time BHC had a UFOC (Uniform Franchise Offering Circular) to use Attorney Clayman's office had instructed it that it could not make franchise sales without either completing a Connecticut registration or having an effectively registered federal trade mark. BHC decided to wait until the latter occurred but two days after it was legally able to sell franchises in non-registered states it was contacted by the Banking Commissioner's office and was once again forced to postpone franchise sales.
When in October BHC was informed that since its trademark was effectively registered and franchise sales could now be made without violating Connecticut law, it was also informed that it would have to disclose the Banking Department's CT Page 252-FFFF allegations and possible penalties. Since this would render the franchises considerably less marketable, the principals postponed any sales until the problems with the Banking Department could be resolved. In the language of the plaintiff, "BHC never had a clean shot at selling a franchise."
In the opinion of this court, this version is more in keeping with the evidence than the conclusion offered by the defendants. BHC's hands were tied and all they could do was send out materials and make follow-up calls and attempt to maintain an active lead base while trying to resolve their legal problems.
The BHC's principals' record as salesmen with respect to their business opportunities sales contradicts any inference that "they could not make a single sale" if in fact they had been given complete freedom to do so.
Although the defendants have consistently denied any negligence, it has been evident from their opening statements that their principal argument has been based upon causation. Basically, defendants claim that even if there was negligence on their part, this negligence was not the proximate cause of the alleged damage to the plaintiffs. They correctly claim CT Page 252-GGGG that this causation must be established with expert testimony. But they also claim that there was no such expert testimony as to causation. They allege that Schatz was not the cause of BHC's demise but that BHC was "improperly and improvidently run, was going no place and would have failed in any event."
As indicated earlier, the court disagrees. The court is of the opinion that there was negligence on the part of S S, Goldman, Dansky and Seidl in that their actions and failure to act constituted a malpractice and that this negligence was the proximate cause of the failure of BHC since it was a substantial factor in bringing about the demise of BHC.
Harold Brown, who by his testimony, made it clear to the court that he was well aware of the standard of care of an attorney in this field in Connecticut and that defendants had violated that standard of care through their negligence, gave his unequivocable opinion that the failure of the lawyers in this case was a "materially contributing factor to the action taken by the Banking Commissioner." He stated further "in my opinion the inactivity and things that were done by the defendant firm's three lawyers materially contributed to the failure of the company." "Had they taken appropriate action at the appropriate time, in my opinion they would have been able to work things out with the agency as I have indicated CT Page 252-HHHH and in a fashion which would have allowed them to survive." He also stated that the failure of the lawyers to do what in his opinion they should have done were factors which materially contributed to and caused serious damage to plaintiffs.
The court agrees with Mr. Brown. The negligence of the defendants left BHC in a position where it had no choice but to close down the business. Its reputation and credit were ruined and the liabilities facing it were overwhelming.
The defendants have relied heavily on the proposition that even if they were negligent, the plaintiff would be unable to prove any damages caused by them because of the "inevitable demise" of BHC. the defendants characterize the company and the principals as "an insolvent company managed by incompetent and dishonest people". They describe the principals as lacking the "integrity" and "experience" needed to operate any business successfully because they were "undisciplined" and "arrogant" and "dishonest."
The court, however, based upon the totality of the evidence, views BHC and the principals in an entirely different light. The court sees three young, ambitious, hardworking people with remarkable sales and organizational CT Page 252-IIII ability who had within a year developed over two million dollars in revenue; opened 65 new businesses on a national scale; assembled a staff including a national sales manager and a marketing director; developed a training program complete with manuals for distributorship and licensees, engaged in extensive advertising; demonstrated their willingness to seek and follow professional advice; who were expanding their knowledge on a daily basis with the growth of their business in the best tradition of American free enterprise and in general were well on their way to success BUT FOR their lack of knowledge of a little known specialized statute and the negligence of their counsel in failing to recognize their violation of same.
Given the direct testimony of Brown, the facts and the circumstantial evidence regarding the required offers of recision, the effects upon BHC s merger with ATS, the need to disclose BHC's history of violations to future purchasers, as well as the liabilities described in Attorney Clayman's opinion letters, it is the opinion of the court that there is more than the required fair preponderance of the evidence to prove that the defendants breached the professional standard of care and that that breach was the proximate cause of the demise of BHC and the consequent loss of profits.
DAMAGES (VALUATION)
CT Page 252-JJJJ
The defendants had as their expert witness on quantification of damages, Irwin Hochberg, a CPA practicing in New York since 1950. Mr. Hochberg is a partner in his own firm, Bloom Hochberg Co., since 1955. Among other activities, he had been an associate professor at NYU teaching financial management in real estate investments. He also lectured of the AICPA (American Institute of Certified Public Accountants). Beginning in 1970 he devoted much of his time to performing due diligence services for various brokerage houses with respect to reviewing the essential ingredients and the reasonableness of limited partnership proposals; mainly in the area of real estate, oil, record distribution, swimming pools, furniture, food and the import/export industry. In November of 1986 tax benefits for limited partnerships were done away with by the government and since that time he has performed due diligence for various insurance companies and financial institutions with respect to loan workouts (grant more loans or foreclose?). He has served as an expert witness in litigation in other jurisdictions in the past.
Mr. Hochberg maintained he did field work at counsel's office and that he examined accounting records, cancelled checks, invoices, publicity materials, schedules, cash journals and that he inspected Coopers Lybrand's work papers CT Page 252-KKKK as well as BHC's payroll records and tax forms, he maintained that he formed no opinion until after he examined these records.
He concluded that BHC was deficient in working capital and its liabilities were six time greater than current assets, that the financial statement showed negative capital of $91,000 and therefore the company was insolvent and was unable to meet its obligations as due. He testified that he is aware of the nature of the business and that the business was inadequately capitalized. Among other things, he opined that the business was headed for disaster and in short order would have to go out of business. He stated that this was not an investment he would recommend; that his prognosis was poor; it was in an unsound fiscal condition and on the way to going bankrupt. He testified that after reviewing Ferreira's report, he found that his projections were speculative and his assumptions not well grounded because they were inaccurate and unreliable. Hochberg then criticized in detail a number of Ferreira's assumptions such as launching the franchise program as of February 1, 1988 as well as the cost of launching the program; the average gross revenue per franchise; Ferreira's omission of the fact that the East Hartford BHC ran for one year and a half and then failed; the assumption of $90,000 per year for equipment sales; the personnel figures and officers' CT Page 252-LLLL salaries.
On cross-examination, the reliability of Mr. Hochberg's comments both as to the fact of damages and as to Mr. Ferreira's quantification of the damages was seriously undermined. He had never done a projection of the type which Ferreira completed in this case (projection of lost profits) and was unfamiliar with the AICPA publications which provide authoritative guidelines as to the role of the CPA as an expert witness in litigation and as to acceptable methods of evaluating damages including projection of lost profits. His knowledge of the operation of the business was flawed. he was not even aware that the officers were the owners. He relied to a large extent upon subordinates for the information on which he based his analysis and, most importantly, the court is of the opinion that Mr. Hochberg was told when he was retained what the defendants wanted him to find, i.e. that there were no damages and that the business was going nowhere. In the court's opinion, he was not acting as an independent and objective expert as required by the standards of his profession. it is interesting to note that the defendants in their briefs practically abandoned his testimony and relied very heavily on their own non-expert opinions as to mr. Ferreira's report.
As a follow-up to the "fact of damage" testimony of CT Page 252-MMMM Harold Brown, the plaintiffs presented as their expert witness in the evaluation of the damages Mr. Thomas Ferreira.
Mr. Ferreira is a partner in a substantial CPA firm in New Haven, Connecticut. He has had 15 years of experience, most of it in business accounting. After he was introduced by plaintiff's counsel and examined as to his background, defense counsel conducted a searching voir dire as to his qualifications to serve as an expert witness. After some rebuttal by plaintiff's counsel, the court ruled that Mr. Ferreira was competent to testify as an expert witness.
He testified that he had carefully followed the AICPA (American Institute of Certified Public Accountants) standards and also the generally accepted accounting procedures (GAAP). His report, consisting of three volumes, being Exhibit No. 206, was introduced into evidence and has been examined in detail by the court. In applying the AICPA rules, he made numerous reasonable assumptions. He testified that all of the assumptions except one were his own, that in his opinion they were reasonable and that they were normal for this type of an engagement and he had adequate information to make these assumptions and reach his conclusions in his projections. He explained that while he had no actual experience in the physical fitness industry or the physical fitness market, he CT Page 252-NNNN had researched the industry and the market and he testified as to information he gathered through conversations with BHC's management team, as well as those outside the business. There is an extensive list of the materials used by Mr. Ferreira in Exhibit 202, as well as a list of the assumptions. Only one assumption was not his own and was given to him by counsel because it was a legal issue which is that there was malpractice.
He testified that he had on one prior occasion appeared as an expert witness for a plaintiff in litigation and in that case he prepared projections similar to those which he used in this case. However, he had used projections in many other situations where he acted as a witness for the defendant; in which situations, although he did not prepare the projections, it was his duty to analyze and comment on them. He also had had on occasion to formulate assumptions for clients and prepare projections for them in many non-litigation matters. He testified that he had done projections for clients in a number of different businesses and that industry — specific knowledge was not required for him to do the projections in this case. Mr. Ferreira consulted with Peter Rusconi, BHC's former sales manager, Pam O'Brien, BHC's former marketing director, and Mike Malinowski, a successful BHC distributor. He also examined work papers prepared by Coopers Lybrand and CT Page 252-OOOO by Touche-Ross, as well as BHC's investor proposal and UFOC. He testified in detail as to the information he used in arriving at his opinions, being the information which is contained in Exhibits 206A, B and C, and he explained its relationship to the projections. Mr. Ferreira had also spoken to Bob Hager with respect to the projections that Hager had prepared as part of BHC's investor proposal, and he felt that Hager's work was consistent with other professionals and it was done in accordance with AICPA standards. Mr. Ferreira stated that he concluded after his study that there were lost profit damages of approximately $22.2 million, and that this estimate does not include damages incurred by plaintiff for injury to reputation, cost of litigation, fines, or punitive damages, if applicable.
He then explained in detail the basic method that he used in arriving at his conclusion. he stated that he used a sales projection approach where he projected future revenue and based on those projected future revenues, he projected future expenses in order to come up with lost earnings. he then converted the lost earnings into cash flow (cash flow being the amount of money that you could take out of the business and still have the business continue). he indicated that lost profits are greater than lost cash flow. he then applied a present value formula. He stated that he started with actual CT Page 252-PPPP numbers as of January 31, 1988 and that those numbers included actual results from the time the company started, which is back in April of 1987 through January 31, 1988. he capitalized these figures through 1996 and discounted thereafter through 1999.
Mr. Ferreira took into account the fact that BHC had already sold 65 locations, 35 of which had been sold by January 31, 1988. He stated that he felt that the sale of business opportunities and the sale of franchises were practically the same thing with the only exception being that BHC was now going to charge for the franchises. The only difference is that the company would be collecting more revenue from franchise fees, royalty fees and advertising fees. In an attempt to be conservative recognizing that there would be a larger commitment to the opening of a franchise, he did not use the remaining 30 businesses that were opened but decided to use approximately 20 per year opening up.
On page 1 of Exhibit B of Exhibit 202, which is a projected statement of income going out 12 years, Mr. Ferreira took into account the fact that the company had sold 65 locations of business opportunities in a period of a year and a half. The first column of this exhibit contains actual figures and shows the number of locations (35) sold through CT Page 252-QQQQ January 1. This information he took off of the Coopers compilation report. After January 1 BHC had actually sold another 30 but he discounted that. He used the growth rate of World Gym (a quoted stock) and he assumed 20 new locations per year. Under cost of equipment sales, Mr. Ferreira scaled back from 62% to 80%. He then took up in detail health products, clothing, company-owned facilities, royalty fees, advertising, operating expenses, under which heading he discussed officers' salaries.
Mr. Ferreira referred the court to Exhibit E of 202 which is a summary of the required personnel and salary projection. He indicated that in his projection a controller would be needed, also a secretary, bookkeepers, and auditors to audit various franchises. The personnel projections also included receptionist, trainers, marketing personnel. He also discussed product control. He then continued showing the need for salesmen and he gave his reasons for each of the various individuals that he had included in his projections, their salaries and his reasons for increase in salary over the projection period. His projections included employee benefits, which would run about 25% of salary and wages, and this would cover things like health insurance, and a profit-sharing plan, if they had elected to put in one, and he agreed that his figures were somewhat high but he wanted to err CT Page 252-RRRR on the high side just in case he was missing anything. He also included payroll taxes, professional fees, advertising and promotion, trade show expense, travel, entertainment, interest expense and income taxes.
He explained that the figure on the bottom line of the first column on the first page of Exhibit B to Exhibit 202 is net income and he stated that that income represents what the profit of the company would be n an annual accrual basis. It is the difference between income and expense.
Mr. Ferreira next explained the statement of cash flow and the importance of cash flow in arriving at the calculation of lost profits. He pointed out that the third line from the bottom on the Statement of Cash Flow corresponds to the first line of the calculation of lost profits, which is the third exhibit in B, and shows the cash ending in each period which is the increase or decrease in cash, i.e. the net change from year to year.
The projection of lost profits is actually in Exhibit C of 202. Mr. Ferreira then explained what is represented in Exhibit C. This begins with a projected change in cash flow each year for 12 years. For these figures each year he added back income taxes realizing that the end result was going to CT Page 252-SSSS be a damage line item. He stated that lost profit damages are generally taxable and thus he was adding back income taxes. He then added back officers' compensation. (The court will comment on this item infra.) Mr. Ferreira explained that he capitalized the lost cash flow for each year at 8% for those years prior to 1996 and discounted them for the years after 1996, and he arrived finally at a total value for the damages based on lost profits at twenty-two million, two hundred and nine thousand, eight hundred and thirty-four dollars.
In answer to questions as to whether or not the value of the business remaining in 1999, at the end of the 12-year period, should be added to the projected lost cash flow, Mr. Ferreira indicated that he did not do this because he felt that having gone out 12 years this is a sufficiently long period of time to compute the damages and he wished to be conservative and not aggressive in his testimony.
Mr. Ferreira was aware of and explained different methods of evaluating a business and multipliers which are used in many such cases. he expressed the opinion that the method he used to value this business was the most generally accepted method for the valuation of a business, especially a closely held corporation. In answer to a question as to whether or not he felt that this company could have survived into the CT Page 252-TTTT future, he outlined some of the factors that he looked into in considering his answer, such as, they had already had a good track record, having sold 65 locations; that from day one they were making money, which is unusual for start-up businesses and that these were positive factors and indicated to him that this business would have continued. In his opinion BHC was not a so-called "development stage company." It already had its infrastructure built up. It had its employees. It was generating revenue and it had a sales force. It had already spent money, significant money, on advertising. He felt that the contemplation of the company in changing the way in which it marketed its products from a business opportunity to a franchise would not change his view of whether it was a development stage company because in his opinion there was no difference between selling a business opportunity and a franchise.
Mr. Ferriera examined financial statements prepared by Coopers Lybrand, internally prepared financial statements, industry data, industry publications, interviews with management and former employees and he had examined the many different materials which appear in Exhibit 206. He testified that he considered these to be typically and reasonably relied upon by professionals in his field in arriving at conclusions as to the damages suffered by a business. CT Page 252-UUUU
The defendants cite a number of cases from foreign jurisdictions applying a so-called "new business" rule under which there is a bar to the recovery of lost profits by a "new business." The Connecticut supreme Court has never held that a prior profit experience is essential to the recovery of prospective profits. West Haven Sound Development Corporationv. West Haven, 201 Conn. 305, 320 (1986); Ball v. PardyConstruction Company, 108 Conn. 549, 551 (1928). In Ball the court stated, "from the very nature of the situation the amount of loss cannot be proved with exactitude." 108 Conn. 551. The court went on to state that the rule consistently applied in Connecticut is that in such cases "all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier of fact to make a fair and reasonable estimate." In Tompkins, Inc. v. Bridgeport,94 Conn. 659, 685 (1920) the court states "No greater degree of proof is required in such [lost profit] cases than in other civil actions." The court allows recovery of future lost profits, fully recognizing that "They are nearly always involved with some uncertainty and contingency; . . . and they can be determined only approximately upon reasonable conjectures and probable estimates."
In the opinion of this court plaintiff's expert presented CT Page 252-VVVV a comprehensive, detailed and conservative analysis of the damages based upon a review of the evidence and reasonable assumptions and inferences. The court is of the opinion that Mr. Ferreira presented a credible and well-reasoned and independent analysis of the damages in this case. His projections were based on factual historical data derived from BHC's operating history, as well as information gathered from reliable other sources as outlined above. He performed his engagement in accordance with the AICPA guidelines and with the highest degree of professionalism. He used an accepted approach to the evaluation of damages due to lost profits.
In his analysis he used two standard texts on the subject. Litigation Service Handbook; Role of the Accountantas an Expert Witness. John Weilly and Son, 1990. He also used the book which is contained in Exhibit No. 205, i.e. AICPAConsulting Services, Practice A 93-94. An examination of this exhibit indicates an example he used almost identical to the facts appearing in this case.
In the opinion of the court the plaintiff has provided through Mr. Ferreira a foundation sufficient to enable the court to make a fair and reasonable award of damage to BHC.
The court accepts the projections used by the plaintiff CT Page 252-WWWW and approves its general approach to arriving at the measure of damages with only one change.
The adding back of the officers' salaries to the cash flow was questioned by the court and the defense during the examination of Mr. Ferreira. In its post-trial briefs the plaintiff has conceded that the officers' salaries should not be added back to the cash flow, citing West Haven SoundDevelopment Corporation v. West Haven. 201 Conn. 836. The court is in agreement. Plaintiffs, however, suggest that lower salaries payable to non-owner officers filling the positions occupied by the three owners would be the appropriate figures to use. The court disagrees and believes that the figures used by Mr. Ferreira are fair to all parties under the circumstances of this case.
Deleting the officers' salaries from the calculation of last profits in Exhibit C of Exhibit #202 the court arrives at $15,931,289.
Accordingly judgment may enter for the plaintiff BHC against the defendants, S S, Goldman, Dansky and Seidl jointly and severally in the amount of $15,931,389.
BREACH OF CONTRACT
CT Page 252-XXXX
In the second count of its complaint the plaintiff, BHC, alleges that the defendants breached their contract to provide timely and correct legal advice with respect to BHC's business including the offering and sale of business opportunities for the Beverly Hills system. In the light of the facts found by the court based upon all the evidence produced at this trial the court is of the opinion that Schatz and Schatz, Goldman, Dansky and Seidl breached their contract with BHC.
The Connecticut Supreme Court has held that a law firm may be liable for breach of contract in connection with providing legal services. Mac's Car City, Inc. v. DeNigris,18 Conn. App. 525, 530 (1989) citing Stowe v. Smith, 184 Conn. 194,198-99 (1981). The defendants correctly point out in their brief that in a case such as this where the allegation in the complaint is that S S breached "the duty that defendant's had assumed under their contract to provide timely and correct legal advice", the plaintiff is required to sustain the same burden of proof by expert testimony as is required in a malpractice case. Citing Legal Malpractice,Mallan and Smith, 4th Ed. 1996. Section 8.6 p. 592. The court is in agreement. However, in the opinion of this court the plaintiff has met the standard and the burden of proof required in the legal malpractice case and in so doing has met CT Page 252-YYYY the burden of proof in the breach of contract case. In Mac'sCar City, supra, the court points out that a breach of contract claim arising from the failure to provide proper legal services must be "couched" in the language of a contract rather than a tort. In the present case the complaint makes allegations clearly sounding in contract. As stated above the plaintiff has met the burden of proof and the standard of proof which is a fair preponderance of the evidence and has met the standard with expert testimony. In the opinion of this court the defendants have breached the contract by the failure to provide the plaintiff with competent legal advice as exemplified by Goldman who effectively abandoned the clients and turned the matter over to Dansky who was not even admitted to practice in Connecticut. He led the plaintiffs to merge their Connecticut and Massachusetts corporations and was responsible for spending time worth over $11,000 in research for a matter as to which the firm was supposed to be expert which in turn led to unnecessary delays. Goldman and Dansky failed to supervise properly the work of Seidl. The defendants failed to put together a franchise program within a reasonable period of time.
Having reached the conclusion that the defendants did in fact breach their contract with the plaintiff, the court is in agreement with the plaintiff that the measure of recovery is CT Page 252-ZZZZ the same as that for legal malpractice claim. Accordingly judgment may enter for the plaintiff against the defendants Schatz and Schatz, Goldman, Dansky and Seidl on the second count of the complaint in the same amount as the judgment in the first count
NEGLIGENT MISREPRESENTATION
The plaintiffs allege a claim for negligent misrepresentation in addition to the claims for legal malpractice and breach of contract. "One who, in the course of his business, profession, or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,202 Conn. 206 (1987). There is no requirement of an improper motive or intent to deceive. Johnson v. Healy, 176 Conn. 97,101 (1978). "The test of negligent misrepresentation involves the breach of a duty to exercise reasonable care in communicating information upon which another may reasonably be expected to rely in conducting their affairs. Under this principle, one making a representation or communication to CT Page 252-AAAAA such another person may even believe [the] representation or communication to be true, but because of his lack of reasonable care in making that representation or communication it is in fact false . . . the ultimate test of the existence of a duty to use care is found in the foreseeability that the harm may result if it is not exercised . . . The test is, would the ordinary man in the defendants' position knowing what he knew or should have known, have anticipated that harm of the general nature of that suffered was likely to result?"Coburn v. Lenox Homes, Inc., 173 Conn. 567, 575-76 (1977). "An actionable misrepresentation, whether made knowingly, recklessly, negligently or innocently must be made for the purpose of inducing action upon it." J. Frederick ScholesAgency v. Mitchell, 191 Conn. 353, 359 (1983). "An allegation of negligent misrepresentation . . . would require proof by a preponderance of the evidence." Rego v. Connecticut InsurancePlacement Facility, 22 Conn. App. 428, 430 (1990). [reversed on other grounds, 219 Conn. 339, (1991)]. See also Calabro v.Calabro 33 Conn. App. 842, 846 (1994). (Quoting a jury interrogatory which asked whether the plaintiff had proven its allegation of negligent misrepresentation by a fair preponderance of the evidence.) On the other hand a finding of fraudulent misrepresentation requires a higher burden of proof, namely, proof by clear and convincing evidence."Meyers v. Cornwell Quality Tools, Inc., 41 Conn. App. 19, 34
CT Page 252-BBBBB (1996).
The defendants in this case represented to the plaintiff that they were experts in the field of franchising. They represented that Mr. Goldman was an expert in this area. Considering all the information made available to Mr. Goldman, his failure to recognize a violation of Connecticut Business Opportunity Act, which act is basic to the area of franchising and the failure of the defendants to advise the plaintiff of the serious consequences of failing to register, taken with the consequences to the plaintiff outlined above, in the opinion of this court brings this matter directly within the purview of a negligent misrepresentation. As pointed out by the plaintiff, even if one credits Goldman's assertion that the plaintiffs were in fact told that the requirement of registration was "a gray area", it was "gray" to Goldman only because he had failed to exercise reasonable care or competence in obtaining or communicating his conclusion to the plaintiffs. D'Ulisse-Cupo, 209 Conn. at 217. On the count of negligent misrepresentation judgment may enter for the plaintiffs in the amount applicable to the first and second counts as outlined above.
INTENTIONAL MISREPRESENTATION
In the fifth paragraph of the complaint, the plaintiff CT Page 252-CCCCC alleges intentional false and misleading information communicated to the plaintiff with the intention to induce the plaintiffs to forbear from pursuing legal action against the defendants. Contrary to the standard of proof with respect to negligent misrepresentation, "A finding of fraudulent misrepresentation requires a higher burden of proof, namely proof by clear and convincing evidence." Meyers v. CornwellQuality Tools, Inc., 41 Conn. App. 19, 34 (1996) and cases therein quoted. While the court is of the opinion that the defendants did make negligent misrepresentations, the court cannot agree that the testimony in this case rises to the level of clear and convincing evidence of intentional misrepresentation. The key to the allegations upheld by the court thus far is negligence.
BREACH OF FIDUCIARY DUTY AND COVENANT OF GOOD FAITH
In the sixth count the plaintiff alleges a breach of the defendants' fiduciary duties and obligations to plaintiff resulting in injuries to the plaintiff and consequent damages.
In the seventh count the plaintiff alleges a breach of the defendants' covenant of good faith and fair dealings with consequent damages to the plaintiff. CT Page 252-DDDDD
Connecticut has for many years recognized breach of fiduciary duty as an actionable tort. The law is well-settled in Connecticut that the relationship of attorney and client establishes a fiduciary relationship. Dunham v. Dunham,204 Conn. 303, 318 (1987). That an attorney-client relationship existed between Schatz Schatz and the plaintiffs is not in dispute in this case. In Matza v. Matza, 226 Conn. 166, 184
(1993) the court stated "The relationship between an attorney and his client is highly fiduciary in its nature and of a very delicate, exacting and confidential character, requiring a high degree of fidelity and good faith." And in Dunham at page 322 the court states that "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." See also Konover DevelopmentCorp. v. Zeller, 228 Conn. 206, 219 (1994).
Contrary to the standard of proof offered by the defendants in their reply brief, the plaintiff states the correct standard of proof which is that once a fiduciary relationship is established, the burden of proving fair dealing properly shifts to the fiduciary and "furthermore, the standard of proof for establishing fair dealing is not the CT Page 252-EEEEE ordinary standard of fair preponderance of the evidence, but requires proof by clear and convincing evidence, clear and satisfactory evidence, or clear and convincing unequivocal evidence." Dunham at pages 322-323. The defendants, in the opinion of this court, have failed to produce clear and convincing evidence of fair dealing. On the contrary, BHC, has in the opinion of the court proven legal malpractice with consequent damage to itself; breach of contract and negligent misrepresentation in representing that the defendants were experts both in franchising law and that the expert would supervise personally the conduct of the defendants' duties toward the plaintiff when, in fact, it lacked expertise in light of the failure to recognize the violations of the Business Opportunity Act by the plaintiff and in the light of the evidence that the principal partner, the one represented to be an expert and supervising the case, practically abandoned the clients, leaving the matter in the hands of a partner who had no experience in franchise law and in a junior attorney and taking into account the additional fact of the wasted time valued at over $11,000 and consequent delay in performance of its duties; all of which led to continued violations of the B.O. Act and consequent penalties sufficient to break BHC.
In the opinion of the court the damages here would be the CT Page 252-FFFFF same as those in counts one, two and three, i.e. lost profits. Accordingly, judgment may enter for the plaintiff BHC v.Schatz Schatz, Goldman, Dansky and Seidl as to the sixth and seventh counts of the complaint.
CUTPA
In the eighth count of their complaint the plaintiffs allege that the defendants have violated the Connecticut Unfair Trade Practices Act (CUTPA). The defendants deny any such violation claiming first that there is a material variance between the allegations of the eighth count which they maintain are limited exclusively to paragraphs 48, 49 and 50 of the fifth count. However, the eighth count encompasses paragraphs 1 through 47 of the first count, and includes paragraphs 48, 49, 50 and 51 of the fifth count and adds paragraph 51. The plaintiff denies any material variance and points out that all of the evidence that it uses in its arguments with respect to CUTPA are covered not just by paragraph 50 of the fifth count but are included in all of the other paragraphs in that count, which paragraphs are all encompassed in the eighth count. The court agrees. There is no variance.
In their denial of the violation of CUTPA the defendants CT Page 252-GGGGG have also alleged that the plaintiff has misstated the law and that it is incorrectly applying CUTPA to the attorney-client relationship. The defendants also deny the CUTPA allegation on the basis that the essence of the plaintiff's claim is that the defendants were negligent, which caused them damage, and the negligent conduct is not a violation of public policy and is not sufficient to satisfy CUTPA standards.
The Connecticut Unfair Trade Practices Act is a remedial statute enacted to foster honesty and full disclosure in the conduct of business. Bailey Employment Systems, Inc. v. Hahn,545 F. Sup. 62 (1982), This statute has been interpreted broadly by Connecticut courts. McLaughlin Ford, Inc. v. FordMotor Company, 192 Conn. 558, 567 (1984); Hinchcliffe v.American Motors Corp., 184 Conn. 607, 615 n. 4, 617 (1981). The Connecticut Supreme Court in denying a jury trial in a CUTPA case gave as a reason "The unique breadth and flexibility of the cause of action created by CUTPA."Associated Investment Company, Ltd. Partnership v. WilliamsAssociates IV, 230 Conn. 148 (1994). In determining whether a practice is unfair or deceptive and therefore a violation of the Connecticut Unfair Trade Practices Act, the Connecticut courts have adopted the federal rule stated in F.T.C. v.Sperry and Hutchinson Company, 405 U.S. 233, 244-45 n. 5 (1972). This is often referred to as the "cigarette rule". A-G Foods,CT Page 252-HHHHHInc. v. Pepperidge Farms, Inc., 216 Conn. 200, 215 (1990). This rule seeks the answers to three questions. (1) Whether the practice without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether it is at least within the penumbra of some common law, statutory or other established concept of fairness (this is referred to as the public policy prong); (2) whether it is immoral, unethical, oppressive or unscrupulous (the unethical prong); (3) whether it causes substantial injury to consumers, competitors or other businessmen (the unfair injury prong). All three criteria need not be satisfied to support a finding of unfairness and the practice may be unfair because of the degree to which it meets all three. Atlantic RichfieldCompany v. Canaan Oil Company, 202 Conn. 234, 242 (1987).Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 106
(1992). In Cheshire the court held that CUTPA was violated when the first and third criteria were met while finding that the practice was not immoral, unethical, oppressive or unscrupulous. If the basis of a CUTPA count is misrepresentation, the plaintiff need not prove reliance or that the representation became part of the basis of the bargain.Hinchcliffe v. American Motors Corporation, 184 Conn. 607, 617
(1981). Knowledge by the defendant of falsity, either actual or constructive, need not be proven to establish a violation CT Page 252-IIIII of CUTPA. Web Press Services Corp. v. New London Motors,Inc., 203 Conn. 342, 363 (1987). The plaintiff need only prove a single act or practice in the conduct of a trade or business to recover under CUTPA.
Proof which satisfies the first prong of CUTPA is not sufficient if the underlying claims sound solely in negligence. Williams Ford, Inc. v. Hartford Courant Company,232 Conn. 559, 592-593 (1995). A.G. Foods, Inc. v. PepperidgeFarms, Inc., 216, 200, 216-217 (1990).
In Heslin v. Connecticut Law Clinic of Trantolo Trantolo, 190 Conn. 510, 520-21 (1983) the Supreme Court said "— we need conclude only that CUTPA's regulation of the conduct of any trade or commerce does not totally exclude all conduct of the profession of law." For the purpose of sustaining an investigatory demand, they conclude that CUTPA applies to the conduct of attorneys.
The court is of the opinion that the defendants claim of variance is without merit. The eighth count clearly encompasses all of the allegations of paragraphs 1 through 50 of the fifth count plus paragraphs 48 and 49 of the fifth count. Specifically the defendants challenge the plaintiff's submission of proof that (1) Goldman said he would personally CT Page 252-JJJJJ supervise the work; (2) Dansky was inexperienced in franchise law and not yet admitted to the Connecticut Bar, and (3) Dansky did not advise plaintiffs to consider separate representation claiming they were not alleged in the complaint. A fair reading of the entire complaint, however, shows that these issues are evidentiary details encompassed within its allegations. Although the court does not regard the items challenged by the defendants as material variances, the court points out that even so a material variance today will be considered only if a timely objection is made at trial. Waterbury Petroleum Products, Inc. v. Canaan Oil andFuel Company, 193 Conn. 208, 224 n. 16 (1984).
The objecting party also must demonstrate that it was "prejudiced in maintaining its defense on the merits, or that it was surprised by the plaintiffs' proof, or that it was misled by the allegations of the complaint." Hillman v.Greenwich, 217 Conn. 520, 531 (1991). The defendants did not object at trial on the basis of an alleged variance, they have not claimed surprise or prejudice and none of the items of proof they challenge represent material variances as indicated above. While the statement made by defendants that "Our Supreme Court has never applied CUTPA to the attorney-client relationship —" (page 50, defendants' reply brief) may be true, in the opinion of this court, given the correct facts CT Page 252-KKKKK CUTPA could be applied to the attorney-client relationship.
While the court disagrees with defendants as to the two points discussed above, variance and attorneys, the court does agree with the defendants as to the third argument which they have made. As stated above in Williams Ford v. HartfordCourant and in A.G. Foods, Inc. v. Pepperidge Farms, Inc.,
negligent conduct alone is not sufficient to satisfy CUTPA standards. Although the plaintiff has been upheld on a variety of counts, each of them is fundamentally based upon negligence. Legal malpractice in this case is based upon the negligence of SS, Goldman, Dansky and Seidl and their failure to adhere to the standards of their profession which was the proximate cause of substantial damage to the defendants. The breach of contract which was the failure to live up to their commitment to their clients was again primarily based upon negligence. The misrepresentation was found to be basically negligent misrepresentation. Again the breach of their fiduciary duty was their failure to live up to the standards of their profession due to their negligence. Although CUTPA is very broad in its applications, it is not to be used as a substitute for other causes of action which are based primarily upon negligence.
On the eighth count of the complaint judgment may enter CT Page 252-LLLLL for the defendants.
To summarize; judgment may enter for the plaintiff as to the claims for legal malpractice, breach of contract, negligent misrepresentation, breach of a fiduciary duty and breach of the covenant of good faith and fair dealing. The measure of damages as to any one such cause of action and as to all is $15,931,289.
Judgment may enter for the defendants as to intentional misrepresentation and violation of CUTPA.
Robert J. Hale State Trial Referee